**ENVIRONMENTAL DEFENSE FUND, INC., et al., Plaintiffs,**

**v.**

**Robert F. FROEHLKE, Secretary of the Army, et al., Defendants, and The City of Osceola, Mo., et al., Defendants-Intervenor.**

**No. 20164–1.**

United States District Court, W. D. Missouri, W. D.

Nov. 8, 1973.

Cost Taxed Dec. 5, 1973.

Injunction Denied Dec. 20, 1973.

Edward Lee Rogers, East Setauket, N. Y., Arthur A. Benson, II, Kansas City, Mo., for plaintiffs.

Irwin L. Schroeder, Dept. of Justice, Washington, D. C., David M. Proctor, Jr., Asst. U. S. Atty., Kansas City, Mo., for Federal defendants.

Lyman Field, Reggie C. Giffin, Kansas City, Mo., for City of Osceola, Mo., et al.

F. Phillip Kirwan, Patrick E. Hartigan, Kansas City, Mo., for Tobin Const. Co.

John C. Danforth, Atty. Gen. State of Missouri, Walter W. Nowotny, Jr., Asst. Atty. Gen. of Mo., Jefferson City, Mo., for State of Missouri.

William H. Bates, Joseph E. Stevens, Kansas City, Mo., for Guy F. Atkinson Co.

John Manning, Kansas City, Mo., for Operating Engineers Local No. 101.

MEMORANDUM OPINION, FINDINGS OF FACT, CONCLUSIONS OF LAW, AND FINAL JUDGMENT AND DECREE

JOHN W. OLIVER, District Judge.

I.

This case pends on plaintiffs' amended motion, filed May 5, 1973 (which amended an initial motion filed April 4, 1973) as further amended by paragraph 88 of plaintiffs' suggestions filed June 29, 1973, as amplified by plaintiffs' brief filed July 20, 1973, and by plaintiffs' suggestions in support of a motion for interim relief filed July 25, 1973, all of which attack the final EIS filed in this case as being inadequate as a matter of law.

Plaintiffs contend that they are entitled to judgment on the merits which would grant blanket injunctive relief.

They have proposed a form of final judgment and decree under which this Court would, among other things, adjudge and decree (1) that the final EIS fails to meet the standards required by NEPA and (2) that the defendants acted arbitrarily and capriciously in failing to carry out the objectives of NEPA.

We find and conclude that plaintiffs are not entitled to any further relief; that under the circumstances of this case the final EIS is adequate and meets the requirements of NEPA; and that there is no basis for any finding that defendants failed to meet the arbitrary and capricious test in regard to their decision to proceed with the project.

## II.

The relevant earlier history of this case is set forth in Environmental Defense Fund, Inc. v. Froehlke (W.D.Mo. 1972), 348 F.Supp. 338. It is not necessary to make any detailed reference to plaintiffs' most recent unsuccessful effort to obtain interim injunctive relief for the reason that the mandate issued by the Court of Appeals in connection with its order of September 24, 1973, affirming this Court's latest denial of plaintiffs' application for interim injunctive relief was received and filed by the Clerk of this Court on October 22, 1973. We shall therefore state only the history which relates to the merits of plaintiffs' present claim and state the reasons for our conclusion that plaintiffs are not entitled to any further relief.

The Court of Appeals concluded its opinion affirming orders entered by this Court on September 13, 1972 (see 348 F.Supp. at 365–366), by noting that in the orders then under review, this Court had retained jurisdiction pending the preparation and filing of a final EIS. It then stated that this Court would thus, "if prompt requests are made, have an opportunity to rule on the sufficiency of the new E.I.S. and an opportunity to review, under the arbitrary and capricious test, the decisions made by the de-

fendants with respect to proceeding with the project" (Environmental Defense Fund, Inc. v. Froehlke (8th Cir., 1973), 477 F.2d 1033 at 1037.

Plaintiffs' initial attack on the final EIS was made April 4, 1973 in the form of a three sentence, single paragraph "Motion for declaration of procedural inadequacy of final environmental impact statement, the invalidity of the decision based on that statement, and for further injunctive relief." That motion sought a blanket injunction against any and all further construction of the project and requested that plaintiffs be afforded a hearing after they had been afforded "adequate pretrial discovery." On April 5, 1973 and on May 30, 1973, we entered orders, copies of which are attached hereto as Appendix A and B, respectively, which were designed to ascertain the real focus of plaintiffs' factual and legal contentions in regard to the final EIS. Those orders were made in light of the scope and standards of review articulated by the Court of Appeals in this and other environmental cases and its implicit admonition that plaintiffs make "prompt requests" to test the sufficiency of the final EIS and to have this Court review, under the arbitrary and capricious test, the decision made by the defendants to proceed with the project.

Although our Court of Appeals has recently concluded in Environmental Defense Fund Inc. v. Froehlke (8th Cir. 1972), 473 F.2d 346 at 351 (*Cache River* case) that "the formal impact statement supplies a convenient record for courts to use in reviewing agency decisions on the merits to determine if they are in accord with the substantive policies of NEPA," we nevertheless directed appropriate pretrial proceedings and set the case for plenary evidentiary hearing as requested by plaintiffs in order to afford them the opportunity to adduce any and all evidence which they deemed relevant and material under the circumstances. Pursuant to the Stipulation on Phase No. VIII, approved July 25, 1973, the Court received in evidence summa-

ries of the testimony which the parties agreed would be given by ten witnesses and received in evidence 44 additional exhibits (one additional exhibit was subsequently admitted without objection).

During the course of those proceedings, the Court's attention was directed to Chief Judge Dalton's opinion in Cape Henry Bird Club v. Laird (W.D.Va. 1973), 359 F.Supp. 404, in which that court directed the Corps of Engineers to prepare and file with all appropriate agencies a supplement to the final EIS which would more fully explain and inform those interested of the methods used by the Corps of Engineers to determine the benefit-cost ratios and to discuss in more detail the questions of navigability and the effect of the dam on a down-stream fishery, should the river be declared to be non-navigable. Defendants requested and the Court granted defendants leave to prepare and file a supplement to the EIS. Such supplement together with an appendix was timely filed.

After the conclusion of the evidentiary hearing plaintiffs filed suggestions in which they requested that we make 122 findings of fact and 38 conclusions of law in connection with questions which plaintiffs contend are for this Court's determination. Plaintiffs filed a memorandum of law in support of their proposed findings and proposed conclusions.

Plaintiffs argued, apparently in summation of their voluminous requested findings and suggested conclusions, that "the deletion of the hydropower unit of the Truman Dam is a viable and reasonable alternative . . . and that therefore the alternatives of the dry-lake dam, or small-lake dam, designed for different sets of operating policies, are also reasonable and viable alternatives." And, apparently as an independent argument, plaintiffs contended that "various statements of fact set forth in the EIS, including some socio-economic, recreational and environmental data have no scientific basis or support in the EIS or

any scientific literature." On page 2 of their post-trial brief, plaintiffs summarized their arguments by stating:

> Plaintiffs have defined the three basic issues of the EIS inadequacies as follows: (1) the failure to disclose the true facts about the economics of the hydropower unit; (2) the failure to discuss the alternative of deleting the hydropower unit and, as a consequence, the failure to discuss, explore and investigate the dry-lake dam and small-lake dam alternatives, and the environmental impacts of these alternatives and to compare those impacts with the adverse impacts of the proposed project, and the failure to disclose the benefits and costs of these alternatives; and (3) the failure of the EIS to disclose or discuss any scientific basis for certain socio-economic, recreational and other environmental data and statements set forth in the EIS in support of the claims of economic and environmental benefits of the proposed project. [Memorandum of law filed August 10, 1973, p. 2]

Plaintiffs concede, as they must, that the final EIS, pp. V–16 to V–20, did in fact discuss "the various alternatives suggested by plaintiffs and others." They argue, however, that such discussion is inadequate as a matter of law, contending that the factual circumstances in this case are comparable to those involved in Environmental Defense Fund v. Froehlke (8th Cir. 1972), 473 F.2d 345 (*Cache River* case). In regard to their argument that "much of the recreational and socio-economic discussion in the EIS is without any scientific or factual basis in fact," plaintiffs cite and rely upon Environmental Defense Fund, Inc. v. Corp. of Eng., United States Army (8th Cir., 1972), 470 F.2d 289 (*Gillham Dam* case).

Plaintiffs' voluminous proposed findings of facts are generally divided into three sections: I—Hydropower Economics; II—Inadequacy of Discussion of Flood Control Alternatives, e. g., dry-

dam or small-lake and the Environmental Impacts of these Alternatives; and III—Failure of the EIS to Provide a Scientific Basis for Certain Sociological and Environmental Data.

Particular of the proposed findings under each section reveal that plaintiffs implicitly concede that the subject matter of a particular proposed finding was in fact discussed in the final EIS but plaintiffs implicitly contend that such discussion failed to give the decision makers any "inkling of the seriousness" of the particular problem or, in other instances, that the discussion was "scanty." Plaintiffs' complaint concerning an alleged lack of scientific basis for certain sociological and environmental data is reflected by plaintiffs' concern with the use of the word "boost" in the final EIS. Plaintiffs would, in order to establish a major premise, have this Court make a finding of fact that "the word 'boost' as it is applied to a local economy has no precise meaning to an economist, i. e., as a characteristic of an economic phenomena it has no meaning."

Plaintiffs propose three additional findings of fact in regard to the use of the word "boost" in the final EIS, the last of which proposed that we find as a fact that "there is no scientific or factual basis for the statement that the Truman Dam and Reservoir project will 'boost' the economy of the area." In somewhat similar manner plaintiffs would have this Court make findings which would resolve in plaintiffs' favor the apparent conflicts between data relied upon by the Corps in the final EIS and that which the individuals who criticized the final EIS believe to be more accurate.

Plaintiffs' proposed conclusions of law reiterate plaintiffs' claim that the various alternatives allegedly were "not adequately explored or discussed in the EIS;" that the benefit-cost summary as it appears in the EIS "is inadequate;" and that similar summaries should have been included in the final EIS in regard to what plaintiffs contend are viable alternatives. Other proposed conclusions are based upon the Corps of Engineers' alleged failure to accept plaintiffs' views in regard to projected rates of growth of per capita income, estimates and projections in regard to recreation visitation days, the preservation of archaeological and paleontological sites, and an alleged inadequate discussion of mitigation plans in regard to fish and wild life.

Although plaintiffs' proposed final judgment and decree would have this Court conclude that the defendants acted arbitrarily and capriciously, the only suggestion that defendants failed to meet the arbitrary and capricious test is somewhat ambiguously stated in plaintiffs' proposed conclusion 25. Plaintiffs there proposed that this Court conclude that "the conclusion that the project will 'boost' the economy of the area is arbitrary and capricious in that it is not supported by any substantial evidence."

While we believe that it is apparent that plaintiffs have almost abandoned any claim that the defendants' decision to proceed with the project was made in violation of the arbitrary and capricious test, we shall nevertheless make appropriate findings and conclusions in that regard in order to avoid possible procedural difficulties which might otherwise arise.

### III.

In regard to the Supplement prepared by the Corps of Engineers pursuant to leave of Court, plaintiffs argue that "the remedy of a mere Supplement is insufficient" and insist that the Court "enjoin work on the hydropower unit and halt work on recently awarded hydropower related contracts" in order that the Supplement be circulated to all relevant agencies for their comments. On October 3, 1973, plaintiffs filed a formal motion for an order requiring defendants to circulate the Supplement to the final EIS among State and federal agencies and private organizations for their comment and that this Court enter

an order requiring defendants to consult with the Council on Environmental Quality with regard to circulating the document and withholding administrative action during the period of circulation.

Plaintiffs' motion to circulate the Supplement for further comment will be denied. We find and conclude that the final EIS is adequate under the circumstances of this case and that the Supplement must therefore be considered as a proper clarification and amplification of an adequate final EIS. We further find and conclude in light of comments submitted by all agencies other than plaintiffs in regard to the final EIS that additional comment on the Supplement would not likely produce additional light for the decision makers.

■ Another preliminary procedural hassle should be resolved before we proceed to the merits. It arose in connection with the manner in which the defendants and intervenors elected to respond to plaintiffs' 122 proposed findings of fact. In accordance with the Court's post-hearing directions, defendants and intervenors filed their request for findings of fact, twelve in number, and proposed five conclusions of law. Defendants and intervenors attached to their suggestions in support of their requested findings and conclusions a response prepared by Corps of Engineers personnel which commented on each of the plaintiffs' 122 proposed findings of fact. Plaintiffs then countered with an alternative motion either to strike the Corps of Engineers' attachment or for a memorandum order declaring that the data submitted in the attachment be declared to be inadmissible or unavailable as evidence in this proceeding.

Plaintiffs' motion to strike the Corps of Engineers' attachment will be denied as moot because we have not relied upon that attachment in any way in connection with any of our findings of fact or conclusions of law.

IV.

Under the procedures established by our September 13, 1972 decree, (see 348 F.Supp. at 346) plaintiffs were afforded the right to prepare comments for use by the Corps of Engineers in its preparation of the draft EIS. On July 31, 1972, plaintiffs submitted a 192 page document in which, pursuant to the provisions of paragraph 1(b) of the Stipulation on Phase V, they set forth all the data, comments, and statements desired by them for inclusion in the draft EIS. That document was in fact included in the final EIS as appendix d in exactly the form submitted by plaintiffs.

Pursuant to the same stipulation, plaintiffs were promptly forwarded a copy of the draft EIS on September 15, 1972, and were granted until October 30, 1972, to present their comments on the draft EIS. Plaintiffs' comments, 26 pages in length, are fully reproduced in appendix e attached to the final EIS. As is apparent from pages VIII–27 to VIII–73 of the final EIS, the Corps of Engineers prepared a detailed response to plaintiffs' comments, paragraph by paragraph, in which it indicated its agreement or disagreement with the suggestions made by plaintiffs and in which, in particular instances, it had added or modified particular portions of the draft EIS in accordance with plaintiffs' comments and suggestions.

■ We believe that plaintiffs' current complaints about the final EIS must be viewed in light of the procedures just described. We, of course, recognize that, as stated in the *Gillham Dam* case, 470 F.2d at 298, "a purely mechanical compliance with the procedures of § 102 is not sufficient to satisfy the provisions of NEPA." And both this Court and our Court of Appeals have indicated their agreement with the principle stated in Calvert Cliffs' Coord. Com. v. United States A. E. Com'n. (1971), 146 U.S.App.D.C. 33, 449 F.2d 1109, 1128, that "consideration of environmental matters must be more than a *pro forma* ritual."

But to say that is to describe but one side of the coin. *Cape Henry Bird Club*, a case to which plaintiffs directed our attention, concluded that " 'Chronic faultfinding' by itself will not invalidate an EIS, and if a detailed study has been made in accordance with the requirements of NEPA, the duty of the court will then be to determine whether the decision to proceed was arbitrary and capricious, and not whether another scientific study should be made" [359 F. Supp. at 412].

Chief Judge Dalton borrowed the "chronic faultfinding" language used in *Cape Henry Bird Club* from Lathan v. Volpe (W.D.Wash.1972), 350 F.Supp. 262 at 266. Chief Judge Beeks, the author of *Lathan*, pointed out in a companion case, Brooks v. Volpe, 350 F.Supp. 269 at 277, that if the court were to require the defendants in that case to perform all of the possible research demanded by the plaintiffs in that case, "the project could be postponed indefinitely, perhaps forever." In rejecting such a motion, Judge Beeks suggested that "Emotional environmentalism must be tempered with rational realism" and added that "Litigants must not be allowed to use NEPA as a tool to destroy federal programs under the guise of interest in the environment."

We do not believe that Judge Beeks literally thought that plaintiffs in *Brooks* were really trying to destroy the federal interstate highway program. The point he was making was that "While Congress has increasingly expressed concern for protection of the natural environment, it has also articulated a strong national policy to complete construction of interstate highways as soon as possible" [350 F.Supp. at 277]. Plaintiffs in that case were apparently attempting to maintain a position not dissimilar from that which plaintiffs have implicitly attempted to maintain throughout the processing of this case in regard to their asserted right to a blanket injunction until a final EIS is filed which meets their approval. And plaintiffs have made clear that they will always oppose any determination that the Truman Dam be built as presently planned.

Plaintiffs have unsuccessfully insisted throughout this litigation that the Congressional policy articulated in NEPA should and must be given exclusive top priority consideration by this and other courts and that "the public interest inherent in the preservation of an adequate NEPA review" may be satisfied only by the granting a blanket injunction under the circumstances of this case. When we initially rejected that notion in determining what relief was appropriate in our September 13, 1972 decree, we twice alluded to the possible practical consequences which might flow from acceptance of such a notion and an announcement of a judicial doctrine which would automatically grant NEPA supremacy over every other Congressional action.

In footnote 5 on page 345 of 348 F. Supp., we directed attention to Congressional action which was then proposed to reverse judicial decisions rendered in connection with the *San Antonio Park* case. And in footnote 9 on page 355 of 348 F.Supp., we pointed to the danger we believed to be inherent in the failure of courts to devise better procedures to deal expeditiously with the Nation's belated recognition of its environmental problems. Most recent Congressional action in connection with a case once hailed as a victory by environmentalists suggests that the concern we expressed over a year ago in regard to possible Congressional disenchantment with NEPA may not have been without merit.

In apparent recognition of the problem, the recent annotation on NEPA appended to *Calvert Cliffs*, published in 17 A.L.R.Fed. 1, considered it appropriate to make reference to newspaper reports of Congressional unrest in regard to the manner in which some NEPA litigation has been conducted. The Interior and Public Works Committee of the Senate and the Public Works Committee of the House were reported to have "discussed

methods for muting the effect of NEPA, so that the failure to prepare an environmental impact statement would no longer allow judicial interruption of the affected project" [17 A.L.R.Fed. at 67].

On page 68 of 17 A.L.R.Fed., the annotator, relying upon an April 17, 1972 New York Times article, stated:

The tenor of the committee may, perhaps, be felt by considering the comments of some of the committee members. One Congressman suggested that the analysis and consideration of a project in the democratic, legislative process should have some finality; stated the Congressman: "I do not know how they [Federal judges] go about resting these insipid and multitudinous suits filed in these courts." Citing one project, in particular, that had been halted because the Army Corps of Engineers had failed to comply with the requirements of NEPA, the same Congressman stated that the suit "showed what a 'bunch of ignoramuses' were on the bench and 'the frivolous' injunctions that they were prepared to issue in environmental cases. Another Congressman cited " 'the growing menace on the horizon' that 'can stop all public works activity in this country,' " and he called for a means of ending "all of these pestiferous suits." The same Congressman concluded: "I like wildlife and fish life and animal life, but mainly the environment exists for human life, and we are improving the environment for human life.

We do not mean to suggest that courts should tailor their construction and application of NEPA to accommodate Congressional complaints about what sort of a statute Congress passed when it enacted NEPA. We do suggest, however, that courts may properly insist that counsel for parties involved in environmental litigation must be required to recognize that Congress did not intend to enact a statute which guaranteed that the views of plaintiffs in environmental cases would prevail over the considered judgment of the ultimate decision makers. And counsel in such cases must also recognize, as Chief Justice Burger stated in Aberdeen & Rockfish R. Co. v. SCRAP, 409 U.S. 1207, 1217, 93 S.Ct. 1, 7, 34 L.Ed.2d 21 that courts may not properly "exercise equitable powers loosely or casually whenever a claim of 'environmental damage' is asserted. The world must go on and new environmental legislation must be carefully meshed with more traditional patterns of federal regulation."

By its enactment of § 102 of NEPA Congress intended to implement the declaration of national policy stated in § 101 by requiring an adequate final EIS which would reflect proper agency study, development, description, and consideration of appropriate alternatives. The purpose of § 102 is amplified in the CEQ guidelines which require rigorous exploration and objective evaluation of alternative action in order to foreclose prematurely any viable option which might have less detrimental environmental effects.

It would seem obvious that the key to effective administration of NEPA lies in the preparation of the final EIS. It would also seem obvious that those who may oppose a particular project on environmental grounds should concentrate their efforts in making certain that the final EIS avoid the defects of vague, general, and conclusory language and the other defects noted in the *Cache River* case. This is not in any way to suggest that the opponents of a particular project are under some sort of duty to write the EIS for the agency. It is to suggest, however, that opponents of a project must recognize that the scope of judicial review is narrow and that their best opportunity to get what they believe is appropriate data into a final EIS for ultimate consideration by the decision makers is in the course of the administrative preparation of the final EIS during which time they are afforded a full and fair opportunity to comment on the draft EIS. In some cases, if procedures directed in this case are

followed in other cases, plaintiffs will have an opportunity to state their view of what the final EIS should contain even before the draft EIS is prepared.

It is simply unrealistic for plaintiffs in this case to assume that this or any other Court is going to make findings of fact which would attempt to resolve the conflicts between data contained and relied upon in the final EIS which may conflict with data which plaintiffs believe is more reliable. For example, plaintiffs' proposed finding 42 would have this Court judicially determine that "reservoir development in Missouri does not increase the rate of growth of per capita income of residents of counties where such reservoirs are located." The economic data cited and relied upon in the final EIS relies upon different data and obviously conflicts with plaintiffs' data and suggested conclusion.

The final EIS makes adequately clear that a conflict in economic theory does in fact exist in regard to the impact of reservoir development on the growth of per capita income of residents of counties in which reservoirs are located. The Congress and other decision makers are therefore appropriately advised of that particular conflict and, as contemplated by NEPA, will have an adequate basis upon which to take into consideration the available data to determine whether that conflict need necessarily be finally resolved, and to give that particular factor whatever weight they may deem appropriate.

The point is that NEPA does not delegate to the judicial branch of the government the duty of resolving similar conflicts which may exist in regard to much of the data which must be included in a final EIS. By its enactment of NEPA, Congress required the agency to support the conclusions stated in a final EIS by setting forth the data upon which such conclusions were based; it did not provide that some court would resolve all conflicts which may be put in focus by other data which might be presented by other parties to a district court of the United States. Congress was most interested to know whether a legitimate conflict may in fact exist within the scientific community but, by its enactment of NEPA, it did not, in our judgment, contemplate or anticipate that courts were to make choices and determine the merits of conflicting views between the two or more schools of scientific thought and to thereafter disapprove any final EIS which may rely upon data which was inconsistent with the court's finding.

The few courts which have been forced to give consideration to contentions which would infinitely broaden the scope of judicial review of a final EIS have reached conclusions consistent with the view just expressed. In Environmental Defense Fund, Inc. v. Corps of Eng. of United States Army (E.D.Ark. 1970), 325 F.Supp. 728, at 740, Judge Eisele dealt with an area of conflicting data which is also present in this case. He appropriately noted that "the methods of calculating cost-benefit ratios are innumerable and in many cases esoteric." He recognized the obvious when he stated that "the Court's judgment as to sound procedures in this regard might well not be in accord with the judgment of Congress."

Judge Eisele therefore refused plaintiffs' invitation to enjoin the expenditure of appropriated funds even though a showing might be made that the benefits were less than the estimated cost. So far as the proper forum in which relief may be sought, Judge Eisele stated that "the plaintiffs and others are free to bring such matters to the attention of the legislative branch at the time any new appropriation for this project is proposed."

Judge Dalton in *Cape Henry Bird Club* expressly followed the Eighth Circuit rule announced both in *Gillham Dam* and *Cache River*, and noted that plaintiffs in that case, as plaintiffs in this, "have been concerned with the Corps' method of determining the benefit-cost ratios" (359 F.Supp. at 412–413). Judge Dalton, we think properly, concluded that the questions of fact in-

volved in connection with the ultimate resolution of conflicting data in regard to the determination of benefit-cost ratios "are solely a matter for Congressional determination."

■ To say that courts will not decide which benefit-cost ratio is sustained by the evidence is not to say that the Congress did not intend to require an agency to adequately set forth the basis of how the agency arrived at the particular ratio it in fact used in regard to the benefits and costs involved in the particular project under consideration. We think it also clear that a final EIS must adequately state legitimate conflicting views in regard to benefit-cost calculations. But the ultimate resolution of benefit-cost questions is for the decision makers, rather than the courts.

It is therefore obvious that persons who contest the agency's benefit-cost factors and calculations and other data about which there may be conflicting socio-economic data should concentrate their efforts in the preparation of their comments on the draft EIS so that the final EIS will clearly and accurately set forth their contentions in order that their views and supporting data may be given appropriate consideration by the decision makers at a later time.

## V.

A few cases have come close to considering the consequences of a failure of an environmental plaintiff to properly utilize the opportunity to comment on a draft EIS. We believe that it is appropriate that we state what we believe are the applicable principles in that regard in order that it be clear that we have not rejected plaintiffs' proposed findings and proposed conclusions on some sort of theory that plaintiffs failed to take proper advantage of the opportunities afforded them during the course of the administrative preparation of the EIS.

In Natural Resources Defense Council v. TVA, 367 F.Supp. 128 (D.C.1973), Judge Taylor, we believe properly, re-

jected defendants' argument that plaintiffs' failure to comment on a draft EIS barred them from maintaining the action on some sort of theory that they had failed to exhaust an available administrative remedy. Judge Taylor, however, noted that in regard to various objections to the final EIS involved in that case which were based on comments which had been filed in connection with the draft EIS the court had the benefit of the views of the defendant in those regards. In regard to points raised only after the final EIS had been prepared and in regard to which plaintiffs had failed to make any comment, Judge Taylor stated:

When neither the governmental agencies nor private organizations responding to the draft statement raise a particular point, which is now advanced by plaintiffs for the first time, the fact that previous comments were silent on the matter may be taken into consideration in passing upon the adequacy of the subject's treatment or omission from the final impact statement. [Ibid. p. 131]

■ At a later point in his opinion, Judge Taylor pointed out the difficulties implicit in complaints about the inadequacy of discussion of a particular point in a final EIS when no one complained that such an alleged deficiency was apparent in the draft EIS. Judge Taylor did not, and we quite agree, conclude that subsequent complaint about the point was somehow "waived." But he did, however, we believe properly, conclude that when those commenting on the draft EIS "fail to make reference to the need for further discussion of a particular subject, then it is reasonable to take this fact into consideration in passing on any deficiency that is later alleged to exist in the treatment given the subject in the impact statement."

We believe the applicable principle is correctly stated by Judge Taylor and that it is therefore appropriate that such principle be applied to the particular circumstances of this case.

## VI.

The circumstances of this case show that in addition to the right to comment on the draft EIS, plaintiffs in this case were afforded an earlier opportunity to make suggestions in regard to the matters which they believed the draft EIS should contain. As we noted in our opinion of September 13, 1972, "plaintiffs were afforded the right under the approved Stipulation to present, and they did in fact present, to the Corps of Engineers on July 31, 1972, all data, comments, and statements which plaintiffs desired to have included in the draft EIS" [348 F.Supp. at 350]. We added that "we know of no other environmental case in which the plaintiff has been granted a legal right to present his ideas and arguments in his own language at this stage in the development" [348 F.Supp. at 350].

In our opinion of September 13, 1972, we stated the following:

The prime objective and purpose of the Phase V Stipulation was to establish the most practicable, expeditious procedures for completion of the preparation of an EIS which would serve as a model for other Corps of Engineer projects and for the projects of other federal agencies. Those procedures afford plaintiffs the fullest possible opportunity to present their ideas and comments in their own language for fair consideration by all decision making agencies, including the ultimate decision maker, the Congress of the United States. [348 F.Supp. at 351]

Plaintiffs' comments prepared July 31, 1972 pursuant to the Stipulation on Phase V are attached to the final EIS as appendix d. Plaintiffs' suggestions in regard to what alternatives should be discussed appear on pages 180 and 181 of that appendix. Page 180 of plaintiffs' discussion of alternatives was directed primarily to flood control alternatives as is apparent from plaintiffs' incorporation by reference of what had already been said in regard to that subject under III, B, 7 of plaintiffs' July 31, 1972 comments. In our September 13, 1972 opinion, we noted that plaintiffs had properly requested that the draft EIS discuss the alternative of total abandonment of the project and the alternative of maintaining the Osage River in a free flowing state. See 348 F.Supp. at 354. Generally speaking, however, it cannot be fairly said that plaintiffs' July 31, 1972 comments requested that the draft EIS discuss in detail the matters about which plaintiffs presently complain.

Plaintiffs' 28 pages of comment on the draft EIS were filed October 14, 1972, and were reproduced in full in appendix e of the final EIS. Neither plaintiffs' general comment nor their particular comment on the alternative section of the draft EIS as the latter comments appear on page 21 request a more full discussion of the matters which plaintiffs now claim were inadequately discussed in the final EIS. Generally speaking, plaintiffs' complaints to the draft EIS directed attention to plaintiffs' basic disagreement with the Corps of Engineers' theories in regard to flood control and to plaintiffs' contention that the Corps' alleged reliance upon structures alone is contrary to the 1966 findings of the President's Task Force on Flood Control. Only a single sentence on page 72 of plaintiffs' October 14, 1972 comments so much as mentions hydropower, or a pricing structure which would reduce peak hour demands. That single sentence did not suggest that those subjects needed to be developed in the sort of detail demanded in plaintiffs' present attack on the final EIS.

Page VIII–64 of the final EIS shows that the Corps of Engineers in fact responded to plaintiffs' single sentence complaint by adding paragraph d on page V–20 of its discussion of alternatives. Plaintiffs now contend that the additional discussion prompted by their single sentence hydropower comment is inadequate as a matter of law. We disagree.

While we are convinced that the discussion of hydropower economics is adequate under the circumstances of this case, we further find that defendants' elaborate treatment of that and the other matters about which plaintiffs somewhat belatedly complain in the Supplement effectively puts to rest any legitimate complaint about the adequacy of the discussion of any subject in the final EIS.

The Supplement to the final EIS prepared by the Corps also fully discusses and responds to issues raised in a report of the General Accounting Office, directs itself to complaints currently made to the final EIS by plaintiffs and updates information concerning naiads, paddlefish, and Rodger's Shelter. We find and conclude that the final EIS adequately discussed all the viable alternatives in sufficient detail to enable reasonable and informed decision makers to fairly and intelligently decide whether or not they wished to continue the project in its present form. We further find and conclude that any possible doubt about that question is conclusively resolved by the additions and amplifications contained in the Supplement to the final EIS, which, under our final order, will be considered by the decision makers together with the final EIS. We are also convinced that the conflicting data as it relates to what is stated in the final EIS and reflected by the comments of the plaintiffs which are included as a part of the final EIS may fairly be resolved by the decision makers. We do not believe that further studies will appreciably add to the available information. In any event, whether further studies need be made is a matter for the decision makers under the circumstances of this case; not this Court.

## VII.

The files and records of this litigation show that plaintiffs were preoccupied with efforts to obtain blanket interim injunctive relief pending the appeal of our orders entered September 13, 1972. Plaintiffs' concentration on that effort, which was finally concluded by the Supreme Court's refusal to consider plaintiffs' application for interim relief which had also been rejected both by this Court and the Court of Appeals, see 409 U.S. 1072, may be related to the quality of the October 14, 1972 comments which plaintiffs filed in regard to the draft EIS.

We believe that it is at least possible that had plaintiffs concentrated on their October 14, 1972 comments on the draft EIS rather than spend their time and energy on other matters that the matters about which plaintiffs now complain would have been given the same sort of attention in the final EIS as the Corps has given those questions in the Supplement to the final EIS. Plaintiffs' failure, however, to have concentrated their efforts on the course of the administrative writing of the final EIS by fully stating their views on the draft EIS has necessarily resulted in the omission of plaintiffs' belated complaints about the final EIS from appearing in plaintiffs' own language in that document.

We believe that an appropriate order may be entered which will effectively remedy the situation which plaintiffs have more or less brought upon themselves. We believe the issuance of such an order is consistent with the challenge implicit in Mr. Justice Blackmun's dissent in Sierra Club v. Morton, 405 U.S. 727, at 755, 92 S.Ct. 1361, 31 L.Ed.2d 636, to which we directed attention in 348 F.Supp. at 341. Mr. Justice Blackmun's challenge to devise new procedures for processing environmental cases is consistent with the gloss of opinions of our Court of Appeals in recent environmental cases. In Environmental Defense Fund, Inc. v. Froehlke (8th Cir. 1972), 473 F.2d at 352 (*Cache River* case), for example, our Court of Appeals indicated that the opinions written by Judge Eisele in *Gillham Dam*, along with the current guidelines of CEQ, and the Corps of Engineers regulations provide appropriate guidelines for the preparation of the final EIS.

We believe that that Court of Appeals opinion implicitly, and perhaps explicitly by its affirmance of Gillham Dam, 470 F.2d 289, approved the order entered by Judge Eisele in Environmental Defense Fund Inc. v. Corps of Eng., United States Army (E.D.Ark.1971), 325 F. Supp. 749, at 760, which directed that opinions expressed by particular qualified experts in regard to the final EIS be added and made a part of the final EIS. He noted that if this was done, "the decision makers can then determine whether to proceed without such a study or to postpone the project while such study is being undertaken."

We believe that if we enter a not dissimilar order which will direct that plaintiffs' Exhibits 1 to 10, inclusive, which contain the testimony of plaintiffs' witnesses, and also direct that those portions of plaintiffs' additional exhibits, adduced pursuant to Stipulation on Phase VIII, to which plaintiffs made specific reference in support of their proposed findings of fact, be included in an appendix and added to the final EIS, the decision makers will thus have available for their consideration the essential evidence upon which plaintiffs based their current complaints about the final EIS. Plaintiffs will also have thus included as a part of the final EIS the essential data to support any argument that they may wish to present to the decision makers in regard to whether the project should go forward or whether the project should be postponed until further studies are made.

## VIII.

In addition to the findings and conclusions made in this memorandum opinion pursuant to Rule 52(a) of the Rules of Civil Procedure, we believe it appropriate to make the following additional formal findings of fact and conclusions of law:

## FINDINGS OF FACT

1. The final EIS meets the basic test of good faith objectivity and the full disclosure requirements of NEPA. It provides an appropriate record upon which the decision makers can arrive at an informed decision. Any possible doubt in that regard is removed by the Supplement to the final EIS and the additional appendix thereto which will be added to that Supplement by order of this Court.

2. The final EIS demonstrates that the Corps of Engineers gave full, good-faith consideration to, and balanced the relevant environmental factors. The Supplement to the final EIS appropriately clarifies and amplifies the areas of concern raised after the preparation of the final EIS.

3. The discussion and development in the final EIS in regard to hydropower and hydropower economics of the proposed project was adequate under the circumstances of this case. Any question in that regard is answered by the Supplement to the final EIS and the provisions of our final order.

4. We make the same finding made in paragraph 3 in regard to the discussion and development in the final EIS as it relates to flood control alternatives, e. g., dry-dam or small-lake; and the environmental impacts of those alternatives. This finding and our finding in paragraph 3 reflect our express rejection of plaintiffs' proposed findings of fact as they are stated in paragraphs 1 to 32, inclusive, of plaintiffs' proposed findings of fact.

5. We likewise expressly reject plaintiffs' proposed findings of fact 33 to 122, inclusive, of plaintiffs' proposed findings of fact, many of which inappropriately request factual findings in regard to matters which are for the determination of the decision makers and not this Court.

6. The discussion and development in the final EIS of benefits and costs of the proposed project is adequate under the circumstances of this case and is appropriately clarified and amplified by the Supplement and the provisions of this Court's final order.

7. We make the same finding made in paragraph 6 in regard to the discussion and development in the final EIS in regard to: (a) the reasonable and viable alternatives to the deletion of hydropower as a project purpose; (b) the benefits and costs of the reasonable viable alternatives to the deletion of hydropower as a project purpose; (c) the various operating procedures and policies for flood control; (d) the environmental impacts, adverse and beneficial, of all reasonable viable alternatives to the deletion of hydropower as a project purpose; (e) the fish and wildlife losses and benefits, and mitigation of such losses; and (f) the socio-economic, recreational, and scientific data to support opinions and beliefs advanced by the final EIS.

8. The fish and wildlife mitigation plan of the defendants, considered in light of the practical "trade-offs" and compromises which were within the contemplation of Congress in the enactment of NEPA, is adequate under NEPA. The additional discussion contained in the Supplement to the final EIS reinforces this finding.

## IX.

### CONCLUSIONS OF LAW

1. The Corps of Engineers acted in good faith in the preparation of the final EIS and the Supplement thereto and in its decision to proceed with the Truman Dam project as presently planned.

2. The final EIS as prepared and filed with the CEQ meets the requirements of Sec. 102(2)(C) of NEPA. The Supplement to the final EIS filed clarifies and amplifies the final EIS and adequately and properly brings up to date matters of current interest and concern raised since the filing of the final EIS for the benefit of upstream decision makers, interested agencies and the public at large. Under our final order plaintiffs' position in regard to their objections to the final EIS and the data upon which it is based is appropriately presented to the decision makers for their consideration and determination.

3. The actions of the Corps of Engineers in studying, developing, and describing appropriate viable alternatives to the recommended course of action on the Truman project, including but not limited to the Corps' preparation of and filing the Supplement to the final EIS on matters of current interest and concern raised since the filing of the final EIS, meets the requirements of Sec. 102(2)(D) of NEPA.

4. The decision by the Corps of Engineers to proceed with the Truman Dam project was within the scope of its authority, not an abuse of its authority, and was not arbitrary or capricious, or otherwise contrary to law.

5. The decision of the Corps of Engineers to proceed with the Truman project should and will not be disturbed by this Court under the circumstances of this case.

## X

### FINAL JUDGMENT AND DECREE

Upon this Court's consideration of the final EIS and the Supplement thereto, together with the Stipulation of the parties on Phase VII and Phase VIII, with the exhibits attached thereto, and the proposed findings of fact and proposed conclusions of law filed by the parties, the Court doth finally Order, Adjudge, and Decree That:

1. Plaintiffs' alternative motion to strike and plaintiffs' motions to require circulation of the Supplement to the final EIS should be and the same are hereby denied.

2. Plaintiffs' Exhibits 1 to 10, inclusive, and the portions of the other exhibits to which plaintiffs made reference in their proposed findings of fact, all of such exhibits having been admitted in evidence pursuant to Stipulation on Phase VIII, shall be reproduced in an appropriate form so the same may and shall be added as an additional appendix to the Supplement to

the final EIS, said appendix to be distributed in the same manner as has been the Supplement to the final EIS.

3. The application of the plaintiffs for an injunction should be and the same is hereby denied.

4. The complaint of the plaintiffs herein should be and the same hereby is dismissed with prejudice.

5. The Corps of Engineers may proceed forthwith with the construction of the Truman Dam project as planned.

6. Costs are awarded to the defendants and intervenors.

## APPENDIX A

### MEMORANDUM AND ORDER

On April 4, 1973 plaintiffs filed a Motion for a Declaration of Procedural Inadequacy of Final Environmental Impact Statement, the Invalidity of the Decision Based on that Statement, and for Further Injunctive Relief. That motion apparently seeks an order (a) declaring the final environmental impact statement to be procedurally inadequate; (b) declaring the Corps of Engineers' decision to proceed to be invalid; and (c) enjoining any further construction of the project. Plaintiffs' motion also asks (d) that plaintiffs be afforded an opportunity to conduct pretrial discovery and (e) that an evidentiary hearing be conducted on the merits of the issues raised by plaintiffs' motion.

Plaintiffs' suggestions in support of that motion make clear that plaintiffs have not attempted to state, even in their suggestions, all of the grounds upon which they may wish to base a claim that the environmental impact statement is procedurally inadequate. The six points of part I of plaintiffs' suggestions are stated in quite general and conclusory language. None of those points make any specific reference to any particular page or even section of the final environmental impact statement.

Part II of plaintiffs' suggestions does not indicate what factual data, if any,

plaintiffs wish to more fully develop on discovery. Part II, however, as does part I, explicitly states that plaintiffs' discussion is not to be considered as an exhaustive discussion of the alleged substantive inadequacies of the Corps of Engineers' decision to complete the project as designed as of January 1, 1970.

Under the circumstances, it is impossible to determine from plaintiffs' motion, even when considered in light of plaintiffs' suggestions, what specific portions of the final environmental impact statement plaintiffs wish to attack or the grounds upon which they intend to rely to support their motion. It is equally impossible to know what discovery plaintiffs may wish to make or what disputed issues of fact, if any, may require a plenary evidentiary hearing on the merits of any issue either raised or which may in the future be raised by plaintiffs under the circumstances.

Past cooperation between counsel has established that they are agreeable to appropriate procedures designed to eliminate or to narrow legitimate areas of factual dispute. Plaintiffs' present motion, however, is stated in such general and conclusory language as to make it impossible to know what further proceedings should be directed in connection with the pending motion.

Accordingly, and in order to narrow and define the issues, it is

Ordered that plaintiffs shall within not more than thirty (30) days prepare, serve, and file an amended motion in accordance with the requirements of Rule 7(b) of the Rules of Civil Procedure. Plaintiffs' amended motion shall state with particularity, in separately numbered paragraphs, the grounds and factual basis for their motion, shall clearly identify the specific pages and portions which they wish to subject to attack; and shall, in separately numbered paragraphs, set forth the relief or order sought by the amended motion. It is further

Ordered that plaintiffs shall, as they may deem it appropriate, attach to their

amended motion and incorporate therein by reference, affidavits which shall set forth the factual circumstances upon which they intend to rely. All attached affidavits shall be written in separately numbered paragraphs so that defendants and intervenors may be directed to admit or deny each particular paragraph of both the amended motion and of each particular affidavit which may be attached thereto. It is further

Ordered that in regard to any ground alleged in a particular paragraph of plaintiffs' amended motion which plaintiffs do not believe may be established by affidavit, plaintiffs shall attach and incorporate by reference an exhibit which clearly states the particular paragraphs which plaintiffs believe must be established by evidence adduced at an evidentiary hearing. Plaintiffs shall, in such exhibit, paragraph by paragraph, state the witnesses they would call and shall state the substance of the testimonial evidence they would adduce by each particular witness. In like manner, paragraph by paragraph, plaintiffs shall attach copies of all documentary evidence they wish to adduce in order that the defendants and intervenors may be required to admit or stipulate the substance of the proposed testimonial evidence and the authenticity of all documentary exhibits which may be attached to plaintiffs' amended motion. It is further

Ordered that within twenty (20) days after service of plaintiffs' amended motion, defendants and intervenors shall prepare, serve, and file an appropriate response to plaintiffs' amended motion. Those responses shall, in accordance with similar past directions in this case, respond with particularity to each paragraph of plaintiffs' motion and to each paragraph of any affidavits which may be attached thereto. Such responses shall clearly state whether, subject to any objection to materiality or relevancy, defendants and intervenors admit in whole or in part, or deny the factual allegations contained in any particular

paragraph of plaintiffs' amended motion and attached affidavits. It is further

Ordered that the responses of the defendants and intervenors shall state whether or not they are prepared, subject to relevancy and materiality objections, to stipulate the substance of the testimonial evidence to be given by the witnesses identified in plaintiffs' amended motion and whether, subject to relevancy and materiality objections, they are willing to stipulate in regard to the authenticity of all documentary evidence attached to plaintiffs' amended motion. It is further

Ordered that the response of the defendants and intervenors may, in the same pattern directed in regard to plaintiffs' amended motion, attach affidavits, name and outline the testimonial evidence to be adduced by identified witnesses, and specify any documentary evidence, the authenticity of which they may desire to have included in an appropriate stipulation. It is further

Ordered that the Court will convene a conference with counsel promptly after receipt of all filings directed by this Memorandum and Order so that further appropriate proceedings may be directed under the circumstances.

## APPENDIX B

### MEMORANDUM AND ORDER DIRECTING FURTHER PROCEEDINGS

On April 4, 1973, plaintiffs filed a motion which they labeled a "Motion for a Declaration of Procedural Inadequacy of Final Environmental Statement, the Invalidity of the Decision Based on that Statement, and for Further Injunctive Relief." On April 5, 1973, on our own motion, and for the purpose of expediting the orderly disposition of this case, we entered an order directing, among other things, that plaintiffs file an amended motion which would, in accordance with the requirements of Rule 7(b) of the Rules of Civil Procedure, state with particularity the grounds and factual basis for their motion. We explicitly stated

in that memorandum and order that it was "impossible to determine from plaintiffs' motion, even when considered in light of plaintiffs' suggestions . . . the grounds upon which they intend to rely to support their motion."

When we entered our order of April 5, 1973, we anticipated that plaintiffs, in accordance with the Local Rules of this Court, would file appropriate suggestions in support of their motion which would further clarify and put in focus the legal theories upon which plaintiffs would base their prayer for relief. No such suggestions were filed.

In our memorandum opinion of October 10, 1972 (Environmental Defense Fund, et al. v. Froehlke, (W.D.Mo., 1972) 348 F.Supp. 338), we concluded that the principles stated in Citizens to Preserve Overton Park v. Volpe, 401 U. S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971), were applicable to cases arising under NEPA. We quoted the portion of the opinion in that case which held that the generally applicable standards of § 706 of the Administrative Procedure Act "requires the reviewing court to engage in a substantial inquiry." We also directed attention, however, to the language of that case which stated that "Although this inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one" and the reviewing court "is not empowered to substitute its judgment for that of the agency." (348 F.Supp. at 341).

In both Environmental Defense Fund v. Corps of Eng., United States Army (8th Cir., 1972), 470 F.2d 289 at 300, and in Environmental Defense Fund v. Froehlke (8th Cir., 1972), 473 F.2d 346 at 353 our Court of Appeals reached the same conclusion. Indeed, in the latter case, it quoted precisely the same language which we had earlier quoted from *Overton Park.* Those standards were applied in both those cases by the Court of Appeals. The opinion of the Court of Appeals in this case made numerous references to both opinions. We must assume that counsel for a common plaintiff in the three cases involving the *Gillham Dam*, the *Cache River*, and this case are intimately familiar with the principles articulated by our controlling court in each of those cases and that they have decided ideas as to how those principles are either applicable to this case or how they should be distinguished. The failure of plaintiffs to articulate such ideas in suggestions in support of its amended motion has necessarily delayed putting the legal question which may be presented in appropriate focus.

Plaintiffs' failure to comply with our order of April 5, 1973, has had a like effect. That order directed and required plaintiffs to state the substance of the testimony of all witnesses they would call should an evidentiary hearing be necessary under the circumstances. We, of course, had in mind (and assumed plantiffs' counsel had in mind) that portion of the Court of Appeals' opinion in the *Cache River* case which stated that a final EIS "supplies a convenient record for courts to use in reviewing agency decisions on the merits to determine if they are in accord with the substantive policies of NEPA" (473 F.2d at 351). We recognized, of course, that if plaintiffs had any claim of bias similar to that asserted in the *Gillham Dam* case, see 370 F.2d at 295, that the substance of such evidence would be revealed by plaintiffs' compliance with our April 5, 1973 order and such evidence would be received at an evidentiary hearing. ·

Although clearly not controlling, see 473 F.2d at 350, we cannot totally ignore the fact that under the Phase V Stipulation plaintiffs were afforded the opportunity to present to the Corps of Engineers by July 31, 1972, all data, comments, and statements desired by them for inclusion in the draft EIS. The Corps of Engineers was required to distribute its draft EIS by September 15, 1972, to all agencies contemplated by NEPA and the CEQ guidelines, and to the plaintiffs so that the comment of those agencies and of the plaintiffs

could be received by October 15, 1972, unless that time was extended by order of this Court for good cause shown.

Part IV of our memorandum opinion of October 13, 1972, 348 F.Supp. at 350–353, was devoted to a detailed discussion of the steps which had been taken and of the further steps to be taken under the schedule established under the Phase V Stipulation. We there stated that:

> The prime objective and purpose of the Phase V Stipulation was to establish the most practicable, expeditious procedures for completion of the preparation of an EIS which would serve as a model for other Corps of Engineer projects and for the projects of other federal agencies. Those procedures afford plaintiffs the fullest possible opportunity to present their ideas and comments in their own language for fair consideration by all decision making agencies, including the ultimate decision maker, the Congress of the United States. In addition, the procedures and the time schedule approved by our final judgment and decree include appropriate provision for judicial supervision, should the necessity arise, and an orderly method of determining whether the EIS as finally prepared is in both form and substance the type of "detailed statement" contemplated by NEPA and other applicable law. [Ibid. p. 351]

We were apparently overly optimistic when we added that "In light of the statements of the parties and their counsel during their conferences with the Court concerning the spirit in which the procedures will be followed, we entertain considerable doubt whether any party will deem it necessary to seek additional judicial action." We recognized, at that time, however, that plaintiffs might, at some future time, decide to attack the validity of the final EIS. The attention of the parties was therefore directed to "Our retention of jurisdiction [which] affords the plaintiffs a prompt and adequate remedy to present any question

that they may have in the future in regard to the sufficiency of the EIS "

The Court of Appeals' opinion affirming this Court's final judgment and decree took particular notice of this Court's retention of jurisdiction to make certain that a proper EIS was prepared and filed in accordance with applicable law and that the decision based upon that EIS was not arbitrary or capricious under applicable standards. The concluding paragraph of the Court of Appeals' opinion stated that "if *prompt requests* are made [that this Court would] have an opportunity to rule on the sufficiency of the new EIS and an opportunity to review, under the arbitrary and capricious test, the decision made by the defendants with respect to proceeding with the project." We cannot believe that the words "prompt requests" were used inadvertently. For those same words were used by the Court of Appeals in its remand of the *Cache River* case. See 473 F.2d at 356.

It is apparent that we were concerned with the question of promptness when we entered our order of April 5, 1973. For it is clear that the general and conclusory language of plaintiffs' original motion could not properly be considered a prompt request for this Court to rule on the sufficiency of the EIS under applicable standards for the reason that plaintiffs' original motion did not state any adequate or particular grounds upon which the question of the sufficiency of the final EIS could be determined. Plaintiffs' original motion and its original suggestions did not adequately state why plaintiffs contend that the decision made by the defendants to proceed with the project should be considered to be either arbitrary or capricious under applicable standards.

Plaintiffs' list of twelve witnesses in the appendix attached to their amended motion and their vague general statement that such witnesses' testimony will cover the "factual allegations" in particular paragraphs of plaintiffs' amended motion neither complies with the explicit

terms of our order of April 5, 1973, nor does it put in focus the rationale of plaintiffs' proposed proof. The difficulty of understanding what plaintiffs consider to be relevant and material evidence becomes immediately apparent when one studies the various paragraphs of plaintiffs' amended motion to which specific reference is made in the appendix. For those paragraphs, generally speaking, do not make any allegation of fact; rather, they reflect a disagreement with some conclusion stated in the final EIS. Any number of the paragraphs so state explicitly; that fact is implicitly demonstrated by examination of many of the other paragraphs of plaintiffs' motion.

Under the circumstances, we believe it imperative that plaintiffs be required to comply with our order of April 5, 1973, and that the deficiencies of their original motion, incorporated by reference into their amended motion, be corrected to the end that plaintiffs' amended motion would, as our order of April 5, 1973 contemplated and directed, state with particularity the grounds and factual basis for their amended motion.

Plaintiffs' prayer for relief indicates that plaintiffs do not want this Court to schedule an evidentiary hearing until after they are afforded an undefined period of time for an "opportunity for discovery." Plaintiffs do not state what it is that they want to discover or how long they want further to delay the scheduling of an evidentiary hearing. In light of the pressures of time implicit in the Court of Appeals' requirement of a prompt request, we do not believe that such an indefinite schedule should be approved by this Court. Indeed, we are convinced that the interests of all parties, including but not limited to plaintiffs, will be best served by requiring plaintiffs, as ordered and directed in our order of April 5, 1973, to state with particularity the grounds for their attack on the final EIS, the nature of the evidence which they wish to discover, the relevancy and materiality of that as yet

unidentified evidence, the substance, relevancy and materiality of all other evidence which they wish to adduce, and to file appropriate suggestions in support of the legal theory upon which their amended motion is based. Accordingly, it is

Ordered that on or before June 15, 1973, plaintiffs will prepare, serve, and file suggestions in support of their amended motion which shall contain:

(a) In part I thereof, a separate section in which they shall set forth, in separately numbered paragraphs, a statement of the steps taken by plaintiffs pursuant to the Phase V Stipulation. Such statement shall also detail the responses, if any, made by the Corps of Engineers thereto. If such steps and responses are reflected in the final EIS and its supporting data, or in correspondence between the parties, plaintiffs shall cite the specific pages thereof and attach copies of any correspondence not contained therein as exhibits to their statement.

(b) In part II thereof, a separate section in which they shall set forth, in separately numbered paragraphs, the testimonial evidence they would adduce by each of the twelve witnesses listed in the appendix attached to their amended motion. This order, of course, reiterates the requirement of our order of April 5, 1973, with which plaintiffs have not yet complied.

(c) In part III thereof, a third separate section shall, in separately numbered paragraphs, set forth with particularity all additional discovery which plaintiffs desire.

(d) In part IV thereof, a fourth separate section shall set forth under appropriately numbered headings, the legal points and authorities upon which plaintiffs rely to support the principles of law which they contend support their amended motion and the procedures which they contend should be followed in the determination of what plaintiffs contend are the ques-

tions presented by their amended motion.

This separate section of plaintiffs' suggestions in support of their amended motion shall state with particularity plaintiffs' specific contentions in regard to the "Questions Presented" and in regard to "Procedures to be followed," each to be supported by appropriate citation of legal authority. It is further

Ordered that on or before June 22, 1973, defendants and intervenors shall prepare, serve, and file appropriate suggestions in opposition. Such filing shall be consistent, so far as possible, with the procedures ordered in regard to defendants and intervenors in our April 5, 1973, order. It is further

Ordered that this case be set for post-trial conference on June 8, 1973, at 1:30 p. m., in order that further appropriate proceedings may be considered and directed, including but not limited to a consideration of the reasonableness of the time schedule above established in regard to the filing of suggestions in support and in opposition to plaintiffs' amended motion.

### MEMORANDUM AND ORDER IN REGARD TO THE TAXATION OF COSTS

This case pends on plaintiffs' motion filed November 20, 1973. That motion and plaintiffs' suggestions in support reflect that plaintiffs intended to have this Court review the amount of costs which the Clerk might tax under the general provision of the sixth paragraph of our final judgment and decree entered November 8, 1973, which stated that "costs are awarded to the defendants and intervenors." We shall consider and treat plaintiffs' motion as a timely filed motion for review filed pursuant to Rule 54 (d) of the Rules of Civil Procedure. We shall state the existing factual circumstances, outline the applicable principles which control the exercise of our discretion, and direct further proceedings under the circumstances.

The Clerk's office, in accordance with the customary practice and usage in this District, and in accordance with the general direction of our order of November 8, 1973, forwarded a blank Bill of Costs, Form A.O. 133 (1–63), to counsel for the defendants and intervenors on November 14, 1973. Counsel for Intervenor List & Clark Construction Company, et al., completed and filed their form in the amount of $1,541.56 on November 19, 1973. Included in the form was a notice that counsel would appear before the Clerk for taxation of costs on Wednesday, November 21, 1973. Not unexpectedly, counsel did not appear. The Clerk has taken no action on that submission.

Counsel for Intervenors City of Osceola, et al., filed their completed form on November 20, 1973, giving the same November 21 notice as to their intended appearance before the Clerk. Although counsel did not appear, a deputy clerk, following routine practice, taxed costs in the amount of $1,716.01 on November 23, 1973. The State of Missouri completed and filed its bill of costs form claiming $229.74 on November 21. The portion of the form relating to when counsel were to appear before the Clerk was not completed. Counsel for other defendants and intervenors have advised the Clerk that they do not wish to have any costs taxed in this case.

On November 30, 1973, the federal defendants filed their completed form claiming $5,891.93, giving notice that they would appear before the Clerk on Monday, December 3, 1973. Although counsel did not appear in accordance with that notice, a deputy clerk routinely taxed costs in that amount under date of December 3, 1973. The deputy clerk who made the certification, however, made the actual notation on the form on November 30, 1973.

Plaintiffs, apparently prompted by the filing of the first bill of costs form, filed what they captioned a "Motion to Amend Judgment" in which they sought to have the language of paragraph 6 changed to read that "costs are award-

ed to the plaintiff," rather than "costs are awarded to the defendants and intervenors." Plaintiffs' suggestions in support of that motion, however, reflect plaintiffs' clear intention to seek a review of the amount of costs which have been and which may be taxed under paragraph 6 of our November 8, 1973 judgment and decree. Such a review, as we have noted, is contemplated by applicable law and is recognized in the last sentence of Rule 54(d).

The lack of procedural precision demonstrated by counsel for all the parties is understandable. Neither the form of plaintiffs' motion nor the failure of counsel for intervenors and counsel for the defendants to appear before the Clerk in accordance with their respective notices have any significant effect upon the question presented in regard to the amount of costs which should be taxed in this case.

Richard C. Peck in his article entitled "Taxation of Costs in United States District Courts", 42 Nebr.Law Review 788 reprinted at 37 F.R.D. 481, appropriately stated that the resolution of the amount of costs is "often fraught with aggravating uncertainty", and, in somewhat of an understatement, added that "some confusion exists [in regard to] the procedure for determining the issue of costs taxable." Peck's article, copies of which are available for curious counsel in the Clerk's office, generally reflects the practice of this District. That article appropriately states that the determination of the final amount of costs "oftentimes [occurs] at the twilight hour of the law suit, becomes a surprise issue consuming too much time in their resolution, and possesses a pesky tendency to invite conflict well out of proportion to the main issue of the original controversy."

Peck comments that "in the ordinary circumstance when judgment is entered it will be silent as to the exact amount of costs to be recovered by the prevailing party," and that "the latent issue of costs to be ultimately included in the judgment usually remains for disposition after entry of judgment." Rule 58 of the Rules of Civil Procedure, in apparent recognition of the delays formerly occasioned by controversies concerning the amount of costs, expressly provides that "entry of the judgment shall not be delayed for the taxing of costs."

While Rule 54(d) relates to the taxing of costs, the notes of the Advisory Committee make clear that the numerous and somewhat confusing Congressional statutes in regard to costs were continued in effect and those and similar statutes as to costs are unaffected by Rule 54(d). The major, and perhaps only, change effected by that Rule was to abrogate the common law rule applicable to common law actions as articulated in Ex Parte Peterson, 253 U.S. 300, 40 S.Ct. 543, 64 L.Ed. 919 (1920), and to adopt the discretionary rule formerly applicable only to equity and admiralty actions.

Because Rule 54(d), consistent with the various statutes contained in Chapter 123 of Title 28, United States Code, permits the Clerk to make the initial taxation of the amount of costs, the first step in the process requires the Clerk to forward to appropriate counsel the bill of costs form. Section 1924, Title 28, United States Code, requires that the bill of costs form be supported by an affidavit attesting the correctness of each item claimed. Rule 54(d) provides that the Clerk may tax the costs "on one day's notice."

While the form contemplates that counsel will in fact appear before the Clerk in accordance with the notice given, no member of the Clerk's office can ever remember any counsel actually appearing pursuant to their notice. Apparently, counsel are fully familiar with the fact that the Clerk's action in regard to the amount of costs taxed is but a· whistle stop in a contested matter and that if counsel are not in accord with the action of the Clerk, they simply exercise the right accorded by the last sentence of Rule 54(d) to have whatever action the Clerk may take in regard to the amount of costs taxed reviewed by the Court upon motion.

Plaintiffs' motion and their suggestions in support of that motion appropriately state their contention that so far as the amount of costs to be awarded is concerned, plaintiffs believe they should be considered as the prevailing parties in the litigation through September 13, 1972, and that, at the least, costs should be awarded plaintiffs for that segment of this litigation.

The suggestions filed by both the defendants and intervenors join issue with plaintiffs' contention in that regard. Intervenors further contend that plaintiffs' motion was untimely filed. Intervenors' argument is based upon the assumption that because plaintiffs captioned their motion as a "Motion to Amend Judgment" that it necessarily followed that plaintiffs had in fact filed their motion pursuant to Rule 59 of the Rules of Civil Procedure. Intervenors then argue that because the ten day period within which a Rule 59 motion may be filed had expired, plaintiffs' motion is untimely.

While plaintiffs' pending motion may not be said to be a model for procedural clarity, we think it amply clear that plaintiffs' pending motion, regardless of its name, is sufficient to seek this Court's review of the action of the Clerk in the allowance of the amount of costs as contemplated by Rule 54(d). Indeed, we believe that the implication of Farmer v. Arabian Oil, 379 U.S. 227, 233, 85 S.Ct. 411, 415, 13 L.Ed.2d 248 (1964), imposes the responsibility on the judge "to decide the cost question himself" and to exercise the discretion vested in him in that regard by Rule 54(d).

 It is unnecessary for purposes of this case to trace in any detail the history of the development of the taxation of costs at common law and the history of the refusal of American jurisprudence to adopt the English practice of making the unsuccessful litigant pay his opponent's litigation expense, including attorney's fees, as well as his own. The manner in which English practice developed is partially stated in Day v. Woodworth, 13 How. 363, 14 L.Ed. 181 (1851).

The temptation to discuss that case more fully is strong because on its facts it involved a dispute between the parties as to how high a dam across a stream should be maintained. Resisting that temptation, we note only that Mr. Justice Grier stated in that case that in the early days of the common law the plaintiff who failed to recover was "amerced *pro falso clamore*" and that should the defendant lose the case, he was to be considered "*in misericordia*" and was therefore to be punished with the *expensae litis*. (Page 371, 14 L.Ed. 181). Such a meat-axe approach was abandoned in England by the passage of the Statute of Gloucester in 1275.

We need not discuss the intervening 600 years of judicial experience with the taxation of costs because all parties in this case concede that under current procedures the matter of taxation of costs is largely within the discretion of the trial judge—discretion which some cases indicate is virtually unreviewable. See, for example, Elastic Fabric Co. v. Smith, 100 U.S. 110, 25 L.Ed. 547 (1879); and DuBois v. Kirk, 158 U.S. 58, 39 L.Ed. 895 (1894), which apparently hold that the award and the amount of costs awarded are not subject to independent appeal.

Nor is it necessary to discuss the various cases cited by intervenors and defendants which discuss the question of who should be considered the prevailing party. It is clear that the language of Rule 54(d) in regard to the prevailing party is not used in a definitive sense. R. F. C. v. Menihan, 312 U.S. 81, 83, 61 S.Ct. 485, 486, 85 L.Ed. 397 (1941) recognized that the portion of Rule 54(d) there involved is "merely declaratory and effected no change of principle." And Fishgold v. Sullivan Corp., 328 U.S. 275, 284, 66 S.Ct. 1105, 90 L.Ed. 1230 (1946), more directly noted that the portion of Rule 54(d) which provides that "costs shall be allowed as of course to the prevailing party" is not "a rigid rule" because of the immediately following quali-

fying language "unless the court otherwise directs" which is contained in the same sentence of the rule.

In Section 2267, page 135, Wright and Miller in Federal Practice and Procedure, properly state, consistent with the gloss of the two Supreme Court cases just cited, that "various circumstances may influence the award of costs in individual cases and result in the prevailing party not receiving costs." And earlier in the same section on page 129, those authors state that "a party who has obtained some relief usually will be regarded as the prevailing party even though he has not sustained all his claims, although in some cases of this type the Court will apportion costs among the parties." We therefore consider the factors which, in our judgment, should control the exercise of the discretion vested in this Court in regard to the amount of costs which should be taxed against plaintiffs.

When we provided in our November 8, 1973 final judgment and decree that costs were to be awarded to defendants and intervenors, we did not intend to amerce the plaintiffs with all of the costs of the litigation since its inception. We anticipated that should any dispute arise about the amount of costs which any party would seek to have taxed, the question presented would eventually come before the Court and that we would then exercise the discretion vested in this Court. That time has now arrived and, in the exercise of our discretion, we shall indicate our view in regard to the amount of costs which should be taxed against the plaintiffs.

Certainly it is clear from what we stated in our memorandum opinion of September 13, 1972, that we were grateful to all the parties and their respective counsel for their cooperation with each other and with the Court in regard to the manner the litigation had been processed up to that point. We expressly stated that it was to their "great credit" that all counsel and all parties had cooperated in the design of procedures for processing environmental litigation which might assist other courts in their handling of this new and unique type of litigation.

There is no doubt in this Court's mind that the cooperation of the parties and counsel exemplified in all proceedings which culminated in our September 13, 1972 judgment and decree resulted in substantial savings to all parties, both by way of expenses in the preparation for trial, including, but not limited to, attorney's fees. It seems fair and just that all parties should bear their own costs up to that point in the litigation, particularly in view of the fact that many of the legal positions taken by plaintiffs were sustained in our September 13, 1972 judgment and decree.

It is our view that the costs incurred by the parties subsequent to the September 13, 1972 judgment and decree occupy a different status. We are not, of course, critical of the plaintiffs for having sought the various reviews which they did seek subsequent to that date. Nor would we in any way be critical of any review which plaintiffs may seek in regard to our final order of November 8, 1973. We are clear, however, that costs incurred before our September 13, 1972 order and those incurred after that date are in different categories. We believe all parties should bear their own costs up to the September 13, 1972 dividing line, and that costs which the intervenors and defendants have incurred since September 13, 1972, should be taxed against the plaintiffs.

We suspect that a single item of costs incurred since September 13, 1972 will relate to defendants' cost of preparing the new Appendix to be added to the Supplement to the EIS. Plaintiffs concede that the Court's directions and orders in connection with the Supplement and the appendix to be added thereto did in fact afford relief "that advances the public policies of NEPA, provided additional information to the public and to the decision-makers and, hopefully, insures a greater degree of informed decisions." Had plaintiffs in an earlier stage of this litigation taken appropriate ad-

vantage of the right afforded them prior to September 13, 1972, under the Stipulation on Phase VI, it is entirely conceivable that it would not have been necessary to prepare either the Supplement or its appendix.

We have noted elsewhere in our memorandum opinion of November 8, 1973 that plaintiffs elected to concentrate their time and efforts elsewhere. It is our judgment that we should exercise discretion in requiring the plaintiffs to pay the reasonable costs of the appendix ordered and directed by our judgment and decree of November 8, 1973, together with items of additional costs which may have been incurred subsequent to our September 13, 1972 order.

In order to have accurate information under the circumstances, it is

Ordered (1) That the Clerk shall promptly forward new Bill of Costs Form A.O. 133 (1–63) to counsel for defendants and intervenors who have heretofore filed Bill of Costs Forms;

(2) That counsel for such defendants and intervenors shall promptly prepare, serve, and file an amended Bill of Costs in which they shall set forth all items of costs which they claim they have incurred in connection with proceedings held in this Court subsequent to our judgment and decree of September 13, 1972, including, but not limited to, the preparation of the appendix ordered under our November 8, 1973 judgment and decree;

(3) That all of such amended Bills of Costs shall notice the appearance of counsel for such intervenors and defendants before the Clerk on Wednesday, December 12, 1973, at 1:30 p. m.;

(4) That counsel for such defendants and intervenors shall appear before the Clerk at that time. Counsel for plaintiffs may appear in the event they have any objection to the amount of costs claimed in the amended Bill of Costs above directed; and

(5) That should counsel for plaintiffs appear before the Clerk and register an objection to any item of costs claimed by any defendant or intervenor, all counsel shall immediately appear before this Court so that further appropriate proceedings may be directed under the circumstances.

In the event counsel for plaintiffs do not appear and register any objection to any item of costs claimed by any party, the Clerk shall tax the amounts claimed in accordance with law.

## MEMORANDUM AND ORDER DENYING PLAINTIFFS' MOTION FOR AN INJUNCTION PENDING APPEAL

### I.

■ This case now pends on plaintiffs' most recent Rule 62(c) motion for an injunction pending appeal. That motion, simultaneously filed with plaintiffs' notice of appeal of our final judgment entered November 8, 1973, was filed December 13, 1973, and, as usual, seeks blanket injunctive relief. We have carefully considered plaintiffs' motion and their suggestions in support and defendants' and intervenors' suggestions in opposition. Plaintiffs' motion will be denied for reasons which we shall outline.

It is necessary only to outline the reasons why we believe we should not exercise the discretion vested in this Court by Rule 62(c) in favor of plaintiffs because the question presented by plaintiffs' most recent application for blanket injunctive relief pending appeal may not properly be said to be novel, so far as this case is concerned.

In our memorandum and order of October 18, 1972, denying plaintiffs' first motion for a blanket injunction pending appeal from the judgment and decree entered September 13, 1972, we concluded that the applicable principles controlling the exercise of our Rule 62(c) discretion were correctly stated in Long v. Robinson, (4th Cir. 1970) 432 F.2d 977 at 979. That case, consistent with other familiar cases, stated that a party seeking interim relief must establish "(1) that he will likely prevail on the merits; (2) that he will suffer irreparable injury if a stay is denied; (3) that other par-

ties will not be substantially harmed by the stay; and (4) that the public interest will be served by granting the stay."

We expressly found and concluded in our memorandum and order of October 18, 1972, that "the public interest would not be served should we grant to plaintiffs precisely the form of blanket relief pending appeal which we refused to grant them on the merits." Following that order, plaintiffs sought and were refused an injunction pending appeal by the Eighth Circuit on November 21, 1972, and by the Supreme Court on December 18, 1972.

Following the Court of Appeals' affirmance of this Court's judgment and decree of September 13, 1972, plaintiffs again sought interim relief which we denied July 31, 1973. That denial was affirmed by the Court of Appeals on September 24, 1973. In its order of that date the Court of Appeals concluded that plaintiffs had failed to make a sufficient showing for interim relief in either this Court or in the Court of Appeals. We think it is also significant that the Court of Appeals had earlier, on April 20, 1973, in its opinion affirming the September 13, 1972 judgment and decree, stated that this case was "[not a case where,] unless plaintiffs receive now whatever relief they are entitled to, 'there is a danger that it will be of little or no value to them, or anyone else, when finally obtained,' Lathan v. Volpe, (9th Cir. 1971) 455 F.2d 1111, 1117."

Plaintiffs' most recent motion does not even allege that the requirements for Rule 62(c) relief stated in Long v. Robinson, *supra,* are satisfied under the circumstances of this case. Plaintiffs' suggestions in support of their pending motion add little to the allegations contained in their motion in that the suggestions only vaguely contend that the claims which plaintiffs intend to assert on appeal "will raise issues of public importance" which "are not frivolous and present serious questions for appellate consideration." Assuming that plaintiffs' suggestions accurately describe what may be an appeal of a substantial question of public importance, such a description is a far cry from complying with the requirement that plaintiffs must allege and establish that they are likely to prevail on the merits of the questions which they intend to present.

We have not overlooked the conclusory statement in plaintiffs' suggestions that they will "suffer irreparable harm by the continued investment in and commitment of funds to this project." Plaintiffs, however, continue to overlook the necessity, in the Court's consideration of a Rule 62(c) motion, of balancing the injury which may be suffered by a plaintiff against the substantial harm that may be suffered by other parties should interim relief be granted. We have heretofore fully stated our view in regard to how we believe that balance must be struck under the circumstances of this case. We therefore incorporate by this reference what we said in that regard in our memoranda and orders of October 18, 1972 and July 31, 1973, which denied plaintiffs' earlier motions for interim blanket relief. We further find and conclude that the manner in which plaintiffs proceeded in accordance with the Court of Appeals' admonition that plaintiffs make "prompt requests" to afford this Court the opportunity to rule the sufficiency of the final EIS and to review, under the arbitrary and capricious test, the decisions to proceed with the project, substantially delayed the final disposition of this case in this Court. That delay, and the month delay in filing a notice of appeal, are additional circumstances which, in our judgment, may properly be considered as adding additional weight in the balance against plaintiffs' prayer for Rule 62(c) discretionary relief.

## II.

We add a word in regard to plaintiffs' reliance upon Scherr v. Volpe, 336 F. Supp. 882, 886 (W.D.Wis.1971), and Environmental Defense Fund v. Tennessee Val. Auth. (6th Cir. 1972) 468 F.2d 1164.

*Scherr* did not involve a Rule 62(c) motion for interim relief pending appeal. What Judge Doyle said in that case must be read in the context of his refusal to suspend the operation of a preliminary injunction issued in the face of defendants' contention that no environmental impact statement of any kind was required with respect to the highway project there involved. Judge Doyle, unlike this Court, was "prepared to say that the plaintiffs here are likely to prevail in their contention." In light of the Court of Appeals' affirmance of our judgment and decree of September 13, 1972, and in light of the other recent cases in that court fully discussed in our memorandum opinion supporting our final judgment and decree of November 8, 1973, we find and conclude that plaintiffs are not likely to prevail on the merits of their noticed appeal. *Scherr*, read as broadly as possible, is clearly distingunishable on its facts.

Environmental Defense Fund v. Tennessee Val. Auth., *supra*, was apparently cited because the Sixth Circuit quoted the same paragraph from Judge Doyle's opinion in Scherr v. Volpe to which plaintiffs directed our attention by their local citation of page 886 of 336 F.Supp. The Sixth Circuit case, however, on its facts, simply affirmed Judge Taylor's granting of a preliminary injunction in connection with a draft environmental impact statement which Judge Taylor found as consisting "almost entirely of unsupported conclusions." See 339 F.Supp. at 809, quoted by the Court of Appeals 468 F.2d at 1170. No Rule 62(c) question was present; plaintiffs' reliance on that case is untenable.

### III.

Part I of the federal defendants' suggestions in opposition and plaintiffs' citation of Environmental Defense Fund v. Tennessee Val. Auth., *supra,* may, at least by implication, tend to raise questions which we believed were settled in regard to whether all parties are proper parties to the case. The federal defendants contend in Part I of their sugges-

tions in opposition that the Corps of Engineers is a "non-suable" entity and that this Court therefore "does not possess the power to enjoin the United States because of the latter's sovereign immunity from injunction."

We concluded in our September 13, 1972 opinion that "this Court has jurisdiction of the persons of the two individual federal defendants by virtue of 28 United States Code § 1391(e)." We added that "Under the circumstances, it is not necessary to determine whether defendant Corps of Engineers may or may not be a suable entity" [348 F.Supp. at 364]. We do not now deem it necessary to reach that question. In order, however, to avoid the injection of possible and, in our view, unnecessary procedural complications, we state that we do not refuse to grant plaintiffs' motion on any theory that the Corps of Engineers is not a suable entity; we intimate no view whatever in connection with that question and state that the exercise of our discretion was not in any way influenced by any consideration of that question.

Plaintiffs' citation and reliance on the Sixth Circuit opinion in the *TVA* case could conceivably be considered as an implicit request that we re-examine and set aside our express finding that the Environmental Defense Fund is a proper party plaintiff in this case. See 348 F.Supp. 358–359. In its *TVA* case the Sixth Circuit was presented with that question and concluded under principles stated in Sierra Club v. Morton, 405 U.S. 727, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972), that "it does not appear that plaintiff Environmental Defense Fund has satisfied the *Sierra Club* test."

Quite frankly, we do not believe that plaintiff Environmental Defense Fund intended such a suicidal citation, particularly in light of the practical consequences which would flow in regard to the shifting of liability for costs on the other plaintiffs in the case.

We shall therefore assume, unless we are advised to the contrary within five

(5) days, that plaintiff Environmental Defense Fund did not intend to reopen the question of its status as a proper party plaintiff and that it is content to leave this Court's finding and conclusion in that regard intact.

For the reasons stated, including what has been said in the earlier memoranda and opinions incorporated by reference, we find and conclude that plaintiffs are not likely to prevail on the merits of their intended appeal; that plaintiffs' alleged injury is outweighed by the substantial harm that would be occasioned by granting plaintiffs' pending motion and that the public interest would not be served by granting such motion.

Accordingly, it is

Ordered that plaintiffs' motion for an injunction pending appeal should be and the same is hereby denied.