Matthew WOIDA, John Tripp, Eugene Quinn, John E. Frolek, Douglas M. Mund, Denver Roseberg, Philip E. Carufel, States United for Rural Environment, Plaintiffs,

v.

UNITED STATES of America, Bob Bergland, Secretary, United States Department of Agriculture, David A. Hamil, Administrator, Rural Electrification Administration, J. W. Ray, Colonel, District Engineer, Omaha District, United States Army Corps of Engineers, United Power Association and Cooperative Power Association, Defendants.

No. 4–77 Civ. 443.

United States District Court,
D. Minnesota,
Fourth Division.

March 10, 1978.

**1380**

Charles K. Dayton, Dayton, Herman & Graham, Minneapolis, Minn., Bruce J. Terris, Washington, D. C., for plaintiffs.

Andrew W. Danielson, U. S. Atty. by Stephen G. Palmer, Asst. U. S. Atty., Minneapolis, Minn., Robert B. Michél, Dept. of Agriculture, Washington, D. C., for defendants United States of America, Bob Bergland, David A. Hamil and J. W. Ray.

Roger C. Miller, LeVander, Gillen, Miller & Magnuson, South St. Paul, Minn., for defendant United Power Association.

John E. Drawz, LeFevere, Lefler, Pearson, O'Brien & Drawz, Minneapolis, Minn., for defendant Cooperative Power Association.

## MEMORANDUM ORDER

ALSOP, District Judge.

### I. FACTUAL BACKGROUND

Cooperative Power Association (CPA) and United Power Association (UPA) are Minnesota cooperative associations. Both are engaged in the business of the generation and transmission of electric power to their respective members. CPA's members are 19 rural electric cooperative distribution systems. CPA's member cooperatives serve residential, agricultural and commercial users in west central and southern Minnesota. UPA's members are 15 rural electric cooperative distribution systems. UPA's member cooperatives serve residential, agricultural and commercial users in central, north central and east central Minnesota and in northwest Wisconsin.

In 1972, CPA and UPA initiated discussions which eventually led to a decision to construct a joint electric generation and transmission project (CU project). The CU project is to consist of the following components and associated facilities: (1) "Coal Creek Station," a 1000 megawatt lignite coal-fired steam electric generating plant located near Underwood, North Dakota; (2) a facility located at the Coal Creek Station site to be used to convert the alternating current (ac) produced there into direct current (dc); (3) a ± 400 kilovolt (kV) dc high

voltage transmission line (HVTL) which is to connect Coal Creek Station with "Dickinson Substation," a conversion facility located near Delano, Minnesota; (4) a 345 kV ac double circuit HVTL which is to run from Dickinson Substation to "Coon Creek Substation," located in Coon Rapids, Minnesota; and (5) a 345 kV ac single circuit HVTL which is to run from Dickinson Substation to the site of a generating facility owned by Northern States Power Company and located near Mankato, Minnesota. The CU project is scheduled to commence commercial operation on November 1, 1978.

Falkirk Mining Company has contracted with CPA and UPA to supply the lignite coal to be burned at Coal Creek Station. That coal is to be extracted from a strip mine located on lands adjacent to the Coal Creek Station site.

At the time that the decision to construct the CU project was made, it was determined that it would be necessary to develop a communication system to link Coal Creek Station to the areas in which the electricity generated was to be used, but the type of system to be installed was not determined until much later. Subsequently, CPA and UPA decided to build and are in the process of building separate microwave radio communication systems which will be used in connection with the CU project.

The Rural Electrification Administration (REA) has provided and will provide loans and loan guarantees to finance much of the CU project. The REA is also guaranteeing that CPA and UPA will perform their contract with Falkirk Mining Company and is providing loans to finance the construction of the microwave radio communication systems. Because financing the CU project constitutes a major federal action, the REA is required to comply with the provisions of the National Environmental Policy Act (NEPA), 42 U.S.C. § 4321 *et seq.*

The REA began an environmental review of the CU project in November 1972. Subsequently, the REA prepared and made available a draft environmental impact statement (EIS) for the project. On October 3, 1973, the REA published notice of the availability of this draft EIS in the Federal Register. Copies of the draft EIS were sent to other federal agencies with jurisdiction over or special expertise concerning various aspects of the CU project, to regional, state and local clearinghouses with an interest in the CU project and to members of the general public who requested them. Comments were solicited. The REA individually answered and incorporated all comments which the agency received into the final EIS. On August 4, 1974, the REA issued the final EIS. On August 6, 1974, the REA published notice of the availability of the final EIS in the Federal Register. Copies of the final EIS were sent to the federal, state and local agencies which had commented on the draft EIS, to appropriate regional, state and local clearinghouses and to members of the public who requested them.

On April 8, 1975, CPA and UPA applied to the Minnesota Environmental Quality Council (MEQC) to designate a corridor for the ± 400 kV dc HVTL. The MEQC then held nine (9) informational meetings and conducted eleven (11) public hearings. After the hearings process concluded, the MEQC hearing examiner issued proposed findings of fact and made a recommendation. On October 3, 1975, the MEQC met, adopted the hearing examiner's recommendation and issued a certificate of corridor compatibility.

On December 9, 1975, CPA and UPA applied to the MEQC to designate a route for the ± 400 kV dc HVTL within the approved corridor and to issue a construction permit. The MEQC made an independent environmental analysis and prepared its own EIS. It also held twelve (12) informational meetings and conducted twelve (12) public hearings. On June 3, 1976, the MEQC designated a route within the approved corridor and granted a construction permit.

On October 6, 1975, CPA and UPA applied to the Minnesota Energy Agency (MEA) for a certificate of need. The MEA then conducted fourteen (14) days of public hearings. On April 2, 1976, the MEA issued a certificate of need.

On June 29, 1976, CPA and UPA applied to the North Dakota Public Service Commission (PSC) for a construction permit to build the ± 400 kV dc HVTL. The PSC conducted fourteen (14) days of public hearings. It also made an extensive analysis of the line's impact on the environment. On December 17, 1976, the PSC designated a route and granted a construction permit.

After the MEQC and the PSC had designated the route for the ± 400 kV dc HVTL, the REA reviewed the effect of the state agencies' actions. The REA determined that, although there were some differences between the designated route and the one proposed by the REA, the designated route was within the corridor proposed by the REA and did not significantly alter the HVTL's impact on the environment. The REA concluded that the differences did not warrant either the publication of a draft supplement to the EIS or the solicitation of comments from other agencies or from the public. After it had reached that conclusion, the REA consulted with the Council on Environmental Quality (CEQ) and proposed that the REA dispense with issuing a draft statement, notice and the opportunity for comment and that it instead publish only a final supplement which would inform government agencies and the public of the route changes. The CEQ raised no objection to the procedure proposed by the REA.

In December 1976, the REA issued a supplement to the final EIS in which route changes in Minnesota were described (Minnesota supplement). On January 4, 1977, the REA published notice of the availability of that supplement in the Federal Register. In March 1977, the REA issued a second supplement in which route changes in North Dakota were described (North Dakota supplement). On March 18, 1977, the REA published notice of the availability of the North Dakota supplement in the Federal Register.

The MEQC route designation was challenged in a number of actions brought in the state courts of Minnesota. The Minnesota Supreme court ordered those actions consolidated and designated a three-judge panel to hear the consolidated actions. The three-judge panel rejected all of the varied challenges to the propriety of the route designation. On September 30, 1977, the Minnesota Supreme Court affirmed the decision of the three-judge panel. *No Power Line, Inc. v. Minnesota Environmental Quality Council*, Minn., 262 N.W.2d 312 (1977). The route designated was also challenged in a civil rights action brought in the United States District Court for the District of Minnesota. In that action the court abstained. *Fuchs v. Minnesota*, Civil No. 4–76-465 (D.Minn., filed Nov. 8, 1976).

During the spring of 1975, CPA and UPA commenced construction of Coal Creek Station. As of January 5, 1978, construction of the first unit was seventy percent complete; construction of a second unit was forty percent complete. Commercial operation is scheduled to begin by November 1, 1978.

The electric power to be generated at Coal Creek Station is intended for distribution through the ± 400 kV dc HVTL. CPA and UPA have acquired more than ninety-nine percent of the easements upon which the ± 400 kV dc HVTL is to be constructed. As of January 5, 1978, CPA and UPA had completed construction of ninety percent of the North Dakota segment of the powerline and five percent of the Minnesota segment. Since that date work has continued with an anticipated completion date of August 1, 1978.

On December 6, 1977, seven individuals who own and/or use lands across which the designated route of the ± 400 kV dc HVTL passes and an organization composed of such persons filed the present action. This action alleges that the REA's financing of the CU project violates both NEPA and the Rural Electrification Act, 7 U.S.C. § 901 et seq. Now before the court is a motion to enjoin *pendente lite* further right-of-way acquisition and continued construction of the ± 400 kV dc HVTL. The basis for the motion is the plaintiffs' claim that the REA's final EIS and the supplements thereto violate NEPA and its implementing regulations.

## II. ISSUE PRESENTED

The building of the ± 400 kV dc HVTL has attracted widespread attention and has been and is the subject of considerable public debate and of acrimonious opposition. The issues being debated in the public arena include the validity of the projections of the energy consumption growth rate and the wisdom of promoting continued growth, the feasibility of the development of alternative sources of energy, the fairness of permitting utilities to exercise the state's power of eminent domain, the desirability of the process now used for siting electric generating plants and transmission lines and the problems of possible long-term biological effects of transmitting high voltage electric current. Those issues are not before this court.

The only issue now before the court is whether or not a preliminary injunction should issue on the ground that the REA failed to comply with the requirements of NEPA when it issued the final EIS for the CU project and its supplements. To resolve the issue thus presented, the court will address the underlying issues raised by the plaintiffs: (1) whether or not the REA followed the required procedure in issuing the supplements; (2) whether or not the final EIS independently or in conjunction with the supplements contains (a) an adequate discussion of the environmentally significant effects of the ± 400 kV dc HVTL and (b) an adequate analysis of the alternatives to its construction as proposed; and (3) whether or not the final EIS must contain a discussion of the environmentally significant effects of the microwave communications systems.

## III. STANDARDS FOR A PRELIMINARY INJUNCTION

Until recently, the standard to be met by a party moving for a preliminary injunction was clearly defined. In *Minnesota Bearing Co. v. White Motor Corp.*, 470 F.2d 1323, 1326 (8th Cir. 1973), the Court of Appeals stated:

In order to justify the issuance of a preliminary injunction by the trial court, the movant has the burden of showing:

(1) substantial probability of success at trial by the moving party, and

(2) irreparable injury to the moving party absent such issuance.

Other factors which may be considered in the decision to grant or to deny the request are the absence of substantial harm to other interested parties, and the absence of harm to the public interest. *Accord, American Train Dispatchers Ass'n v. Burlington Northern, Inc.*, 551 F.2d 749 (8th Cir. 1977); *Willmar Poultry Co. v. Jones*, 430 F.Supp. 573 (D.Minn.1977); *Cox v. Northwest Airlines, Inc.*, 319 F.Supp. 92 (D.Minn.1970).

However, the Court of Appeals recently urged this court to consider the adoption of alternative standards. *Fennell v. Butler*, 570 F.2d 263 (8th Cir., 1978). *Fennell* suggests that the appropriate standards should be those of the Second and Ninth Circuits and that a preliminary injunction should be granted not only when the moving party has satisfied the requirements of the traditional test but also when the moving party raises sufficiently serious questions going to the merits to make them a fair ground for litigation and is able to demonstrate that a balancing of the hardships tips decidedly in his favor. *Id.* at 3; *see also William Inglis & Sons Baking Co. v. ITT Continental Baking Co.*, 526 F.2d 86 (9th Cir. 1975); *Sonesta Internat'l Hotels Corp. v. Wellington Associates*, 483 F.2d 247 (2d Cir. 1973).

■ The question of the standard to be applied may not have reached its final resolution. Nevertheless, the court considers the matter before it to be one which requires a speedy and final resolution. In order to avoid any uncertainty which might result if the court were to apply only the more established standard enunciated in *Minnesota Bearing*, the court will resolve the pending motion in light of both the traditional standard and the alternative standard set out in *Fennell*.[1]

1. The verbal differences of the two formulations perhaps do not reflect substantive disagreement. 11 C. Wright & A. Miller, *Federal Practice & Procedure*, § 2948, at 451–52 (1973).

## IV. MERITS OF THE CASE

### A. Procedural Adequacy of the Supplements

The plaintiffs first contend that both the Minnesota and North Dakota supplements were promulgated in a procedurally inadequate manner. The court does not agree.

The facts are virtually undisputed. Prior to issuing the supplements in their final form, the REA issued no draft version of the supplements. Neither did the REA provide for comment by governmental agencies with jurisdiction and special expertise or by the public, nor did it give newspaper notice.

■ It is undisputed that prior to issuing a final EIS the REA must prepare a draft, provide notice of its availability, allow time for comment by governmental agencies and the public and consider and respond to those comments. 40 C.F.R. § 1500.2(b) (1977). However, the court is convinced that the REA is not required to follow such a procedure every time that it issues any statement purporting to describe the environmental impact of an action which the REA proposes to undertake. *See* 40 C.F.R. § 1500.11(b) (1977).[2]

■ The plaintiffs suggest that 40 C.F.R. § 1500.11(b) (1977) requires publication of a draft statement, notice and provision for an opportunity to comment whenever a final EIS is supplemented. Such an interpretation would render meaningless the provision that an agency should consult with the CEQ "with respect to the possible need for or desirability of" following such a procedure when it intends to supplement a final EIS. If recirculation were mandated whenever an agency intended to supplement a final

EIS, consultation about the desirability of recirculation would serve no useful purpose. *Cf. Environmental Defense Fund, Inc. v. Froehlke,* 368 F.Supp. 231, 236–37 (W.D.Mo. 1973), *aff'd sub nom., Environmental Defense Fund, Inc. v. Callaway,* 497 F.2d 1340 (8th Cir. 1974).

The plaintiffs next suggest that publication of a draft statement, notice and an opportunity to comment are required whenever an agency intends to substantially modify a project which it had previously proposed and analyzed in an EIS. Although that may well be a reasonable interpretation of 40 C.F.R. § 1500.11(b)(1977), it would be of no benefit to the plaintiffs.

The REA, the agency vested with the statutory authority to make such a determination, studied the route changes required to make use of the route designated by the MEQC and the PSC. The REA's analysis led the agency to conclude that the only significant environmental impact which would result from the route changes would be an impact on land use. The REA found that the characteristics and uses of the land traversed by the segments of the route originally proposed by the REA and now to be abandoned and those of the land traversed by the segments newly designated by the MEQC and the PSC were predominantly agricultural. The REA determined that the purpose of the changes was to minimize the impact on certain agricultural activities and that the changes would accomplish that purpose. The REA then concluded that the route changes were insignificant and did not substantially modify the CU project even though the changes would

What is clear is that the moving party must present a *prima facie* case but need not show that he is certain to win, that the degree of likelihood of success is to be considered and balanced with the comparative injuries to be incurred by the parties and that preliminary relief should be denied if the moving party can be granted full relief when the matter is ultimately determined on the merits. *See* Leubsdorf, *The Standard for Preliminary Injunctions,* 91 *Harv.L.Rev.* 525 (1978).

2. 40 C.F.R. 1500.11(b) (1977) provides in pertinent part:

 An agency may at any time supplement or amend a draft or final environmental statement, particularly when substantial changes are made in the proposed action, or significant new information becomes available concerning its environmental aspects. In such cases the agency should consult with the Council with respect to the possible need for or desirability of recirculation of the statement for the appropriate period.

increase slightly the length of the ± 400 kV dc HVTL. *Cf. Iowa Citizens for Environmental Quality, Inc. v. Volpe,* 487 F.2d 849, 852 (8th Cir. 1973).

The plaintiffs claim that the REA's conclusion is entitled to little, if any, credence. In addition, they argue that the route changes necessarily constitute a substantial change in the project. However, the plaintiffs have made no direct attempt to demonstrate that the route changes amount to a substantial change; they have submitted nothing to show that the environmental impact occasioned by the changes differs in any way from the impact of the original route. Instead, the plaintiffs rely on excerpts from correspondence between the REA officials and members of the general public. The letters to which the plaintiffs direct the court's attention state that the REA would take no further action with regard to the CU project until it had prepared and issued supplements which described the changes resulting from the route designation by the MEQC and the PSC. The plaintiffs ask the court to infer from this that the REA recognized that the final EIS was invalidated by a substantial change and that the agency could not proceed with the proposed project until it had prepared supplements to the final EIS. The court cannot draw those inferences because to do so would be to disregard other REA correspondence also submitted by the plaintiffs. It is apparent that, although the REA recognized that at least one of the route changes involved substantial distances, the agency never considered the route changes themselves to constitute substantial change in the CU project. The REA never believed that 40 C.F.R. § 1500.-11(b) (1977) required recirculation of the supplements and never intended to do so. The REA intended the supplements only as a device by which the agency would be able to inform other governmental agencies and the public of the route changes and of its assessment of the impact caused by those changes.

The plaintiffs also suggest that the REA was required to supplement the final EIS because of the final EIS's inadequacies and that, therefore, the REA was also required to issue the supplements in draft form, to give notice and to allow public comment. This challenge is one directed not to the procedure used in issuing the supplements but to the content of the final EIS. Even if the supplements had purported to remedy an admitted inadequacy in the final EIS, issuance of a draft version, proper notice and opportunity for comment would not be required. *Environmental Defense Fund, Inc. v. Froehlke, supra* (recirculation not required for supplements to inadequate final EIS); *but see Natural Resources Defense Council, Inc. v. Callaway,* 524 F.2d 79 (2d Cir. 1975). Moreover, the supplements do not attempt or purport to remedy any inadequacy in the final EIS; they are directed only to describing what the REA concluded to be insubstantial changes in the CU project. The court will not permit the plaintiffs to bootstrap their attack on the adequacy of the final EIS into an attack on the procedure used in issuing the supplements.

The court finds that the supplements were issued in a lawful manner. Therefore, as to the alleged defects in the procedure used to issue the Minnesota and North Dakota supplements, the court concludes that the plaintiffs have failed to demonstrate a substantial probability of success on the merits or to raise sufficiently serious questions going to the merits to make them a fair ground for litigation.

## B. Substantive Adequacy of the Final EIS and Its Supplements

The plaintiffs also contend that the supplements included insufficient detail, that the final EIS failed to adequately analyze alternatives to the route proposed by the REA and failed to describe significant effects to be occasioned by the construction and operation of the ± 400 kV dc HVTL along the proposed route and that the final EIS and the supplements failed to include an analysis of the microwave communication system.

## 1. Standard of Review Under NEPA

■ Section 102 of NEPA, 42 U.S.C. § 4332 provides in pertinent part:

The Congress authorizes and directs that, to the fullest extent possible:

\*　\*　\*　\*　\*　\*

(a) all agencies of the Federal Government shall—

\*　\*　\*　\*　\*　\*

(c) include in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on—

(i) the environmental impact of the proposed action,

(ii) any adverse environmental effects which cannot be avoided should the proposals be implemented,

(iii) alternatives to the proposed action,

(iv) the relationship between short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and

(v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented.

If an EIS is to pass muster, it may not be so vague, general and conclusory that it cannot form the basis for reasonable evaluation and criticism. However, the touchstone of the judicial inquiry is reason. *Minnesota Public Interest Research Group v. Butz*, 541 F.2d 1292 (8th Cir. 1976), *cert. denied*, 429 U.S. 935, 97 S.Ct. 347, 50 L.Ed.2d 304 (1977).

## 2. Adequacy of the Supplements

■ The plaintiffs first suggest that the supplements were inadequate because they failed to describe sufficiently the impact of the route changes. However, the rerouting of a powerline from a place where it would cross tillable farmland to another place where it would also cross tillable farmland does not require the more exhaustive analysis which would be required if the alternative routes were to affect different environmental uses or if one of the alternative routes were to affect some other feature of unique environmental interest. *Iowa Citizens for Environmental Quality, Inc. v. Volpe, supra.*

## 3. Adequacy of the Final EIS

### a. Alternative Routes

The plaintiffs next suggest that the final EIS failed to consider important and feasible alternatives to the route selected for the ± 400 kV dc HVTL. The plaintiffs suggest that one alternative route would be one parallel to Interstate 94, another would be one parallel to the Soo Line Railroad tracks and yet another would follow section lines.

It is clear that the final EIS did not analyze these alternatives in the fashion suggested by the plaintiffs. However, it is equally clear that the REA did consider a broad range of alternatives, including not building a generation facility, building the facility in the area in which the power would be used, upgrading existing transmission lines, purchasing electric power from other producers and making use of underground transmission facilities. The REA also considered the environmental values involved in its selection of a particular proposed route from the virtually unlimited number of possibilities for linking Coal Creek Station with Dickinson Substation.

The REA reviewed a report prepared by an independent consultant and incorporated it into the final EIS. That report describes the route selection methodology. The method used involved defining a study area of 36,240 square miles; collecting and organizing data about that area's physiography, water resources, climate, vegetation, soils, wildlife and land use; rating environmental and cultural variables; preparing a composite rating for each square mile in the study area; and identifying potential routes. The consultants then evaluated the potential routes for suitability in terms of visual and aesthetic impact.

■ The court concludes that it may consider the consultant's report which is incorporated in the final EIS in determin-

ing the adequacy of that statement. *Jackson County v. Jones*, 571 F.2d 1004 (8th Cir., 1978); *Life of the Land v. Brinegar*, 485 F.2d 460 (9th Cir. 1973). The court is satisfied that the final EIS was sufficient to acquaint the REA with the environmental values involved and with the tradeoffs that would have to be made in choosing one of the available alternatives. The consultant's report which was incorporated into the final EIS identified the values which that report presupposed. It allowed the REA to make an informed judgment concerning the environmental values adopted in choosing between the alternative routes. Admittedly, the method of quantification used in rating the environmental values was a matter of opinion. However, as such, it was a matter within the discretion of the REA. *Minnesota Public Interest Research Group v. Butz, supra* at 1302. The REA chose to adopt the values contained in the consultant's report as its own and incorporated them into the final EIS. The final EIS then allowed the REA to reach an informed decision. Because it did, the final EIS is adequate. *Environmental Defense Fund, Inc. v. Froehlke*, 473 F.2d 346 (8th Cir. 1972).

The plaintiffs also suggest that the final EIS did not contain a sufficient discussion of the environmental impact of the alternatives which it did discuss. It is true that the discussion of the three alternatives considered in the final EIS was brief. However, brevity alone does not mean that a discussion will be deemed to be inadequate.

An EIS is not required to document every conceivable problem from every conceivable angle. *Iowa Citizens for Environmental Quality, Inc. v. Volpe, supra* at 852. Because the environmental considerations associated with each of the alternative routes were readily identifiable and because the environmental impacts differed more in degree than in kind, it was reasonable for the REA to state succinctly the advantages and disadvantages of each alternative. In addition, the plaintiffs have made no attempt to present other types of information which might have contributed to a more informed decision-making process. Therefore, the court will not require the REA to supplement the EIS with types of information which may not exist.

### b. Health and Safety Factors

The plaintiffs also challenge the adequacy of the final EIS on the ground that it fails to analyze certain potential effects on health and safety associated with the electrostatic and electromagnetic fields to be created by a $\pm$ 400 kV dc HVTL. It is undisputed that the transmission of electricity through a HVTL creates electrostatic and electromagnetic fields around the line. However, the record is devoid of competent evidence that the fields surrounding the $\pm$ 400 kV dc HVTL will pose any real danger to human health and safety or to the environment.

The plaintiffs suggest that there may be dangers posed by electrical charges induced in ungrounded objects located in the vicinity of the line and by ozone produced by electrical discharges from the line. It seems undisputed that some HVTLs induce electrical charges in ungrounded objects and that some HVTLs stimulate ozone production. Indeed, the consultant's report which is incorporated into the final EIS discusses these questions in connection with the 345 kV ac HVTLs. The plaintiffs ask the court to conclude that the potential dangers are such that they necessarily required discussion in connection with the $\pm$ 400 kV dc HVTL. The court will not do so.

The record establishes that the REA made a preliminary determination that the possible dangers associated with the $\pm$ 400 kV dc HVTL's inducing of electrical charges and producing ozone were so remote and speculative that they did not require discussion. That determination is supported by the great weight of scientific literature and by the consultant's reports. The report dealing with the 345 kV ac HVTLs discussed those issues and concluded that there would be no harmful effects; the report dealing with the $\pm$ 400 kV dc HVTL did not discuss those issues. Be-

cause of the substantial similarity between the formats of the two reports, it seems reasonable to infer that the REA consciously determined that a dc HVTL posed no such danger. Because of the REA's expertise in the field, the court will accord it considerable deference. In addition, the question of ozone production was raised in the state court proceedings. There the administrative agencies and the courts reviewed a more complete record. They found that danger from increased levels of ozone in the atmosphere was minimal and remote. *No Power Line, Inc. v. Minnesota Environmental Quality Council, supra.*

#### c. Agricultural Aviation

The plaintiffs next suggest that the final EIS failed to discuss the effects of the ± 400 kV dc HVTL on agricultural aviation. It is undisputed that an EIS dealing with a HVTL must discuss 'the line's effects on "airports and paths of low-flying aircraft." *See* REA Bulletin 20–21; 320–21, 39 Fed.Reg. 23245 (1974). However, the court is of the opinion that such a requirement mandates only a discussion of a HVTL's effect on airports and their approaches. The final EIS contains such a discussion.

It is also clear that some crop-dusting and aerial seeding operations will be affected to at least a limited degree by the construction of the ± 400 kV dc HVTL. It undoubtedly will be necessary for pilots performing such operations on lands crossed by the line to exercise additional care; it may be necessary for such pilots to perform their tasks in a manner other than the one which they would now choose.

However, the court is convinced that the focus of the REA regulation is not directed toward agricultural aviation. The regulation seems to require consideration of take-off and landing problems and other specific situations which create a hazard for an unsuspecting cross-country pilot; it seems to pay little heed to the problems of the aerial applicator who will be confronted with another obstacle to be avoided. Therefore, the court concludes that the fi-

nal EIS is not defective because of its failure to discuss the impact of the ± 400 kV dc HVTL on agricultural aviation.

#### d. Microwave Communication Systems

Finally, the plaintiffs suggest that the final EIS is inadequate because it failed to describe the environmental impact of the "microwave communication system" to be used in connection with the CU project. The plaintiffs argue that the microwave communication systems are an integral part of the CU project and should be included in the EIS which describes that project. The court rejects this challenge as being without merit.

 Construction of a microwave communication system does not require an EIS. If the microwave communication systems and the CU project were parts of an interdependent, indivisible, integrated whole, a comprehensive EIS might well be necessary. *See Minnesota Public Interest Research Group v. Butz, supra; Sierra Club v. Stamm,* 507 F.2d 788 (10th Cir. 1974). The court concludes that they are not parts of a whole. First, the microwave communication system is not one system, but two. Both CPA and UPA intend to operate separate systems. Secondly, although the microwave systems will be used in conjunction with the CU project, the systems have utility independent of that project, and parts of the systems would be built even if the CU project were not to be built.

#### e. Conclusion

 The court concludes that the plaintiffs have failed to demonstrate a substantial probability of success on the merits or sufficiently serious questions going to the merits to make them a fair ground for litigation as to their claims that the substance of the final EIS and its supplements is inadequate. The court is satisfied that the final EIS and its supplements were sufficient to permit the REA to make a reasonable evaluation of the CU project.

#### 4. Lack of Merit in the Present Challenge

The court is also convinced that it is incumbent upon those who later choose to challenge the sufficiency of an EIS or its failure to analyze alternatives to have submitted comments calling attention to alleged deficiencies and suggesting colorable alternatives. The whole purpose for circulating the draft EIS in 1973 was to allow governmental agencies and the public to submit such comments. If the plaintiffs had done so, it is clear that the REA would have been required to undertake a preliminary investigation, the scope of which would be such as to enable the agency to reach an informed judgment as to whether the issues raised merited more detailed consideration. *See Aeschliman v. United States Nuclear Regulatory Comm'n*, 178 U.S.App.D.C. 325, 547 F.2d 622 (1976).

A course of action such as that suggested would present two distinct advantages. First, it would avoid the necessity that a technically illiterate court make a factual determination in the first instance as to whether a discussion of environmental impacts is sufficiently reasonable or whether an alternative is feasible. *Cf. Ethyl Corp. v. Environmental Protection Agency*, 176 U.S.App.D.C. 373, 541 F.2d 1, 60 (1976) (*en banc*) (Bazelon, C. J., concurring). More importantly, it would afford the person with legitimate environmental objections an opportunity to influence the agency's decision. *See Environmental Defense Fund, Inc. v. Froehlke*, 368 F.Supp. 231 (W.D.Mo. 1973).

The mere fact that no governmental agency and no member of the general public had submitted comments concerning a draft EIS would not be determinative of the statement's adequacy. However, the court is of the opinion that the total lack of comment by the plaintiffs or by the governmental agencies with special expertise buttresses the court's conclusion that the statement is adequate.

In addition, some of the issues which the plaintiffs now raise were also raised before the MEQC and the PSC and in the state courts. The arguments which the plaintiffs now make were rejected in those proceedings. The court is of the opinion that those prior determinations that some of the arguments now raised were without merit also supports the court's conclusion that the plaintiffs have failed to demonstrate any likelihood of success or to raise questions serious enough to require further litigation.

### V. HARM INVOLVED

The court concludes that the plaintiffs have shown neither a substantial probability that they will succeed on the merits nor sufficiently serious questions going to the merits to make them a fair ground for litigation. In view of that conclusion, in the usual case it would not be necessary to address the issue of harm. However, in view of the considerable public interest in this matter and in order to speed its final disposition, the court will address itself to the question of harm.

#### A. Irreparability of Harm

It is clear that a preliminary injunction is not to issue unless the threatened harm would impair the court's ability to grant an effective remedy at the time of final adjustment. 11 C. Wright & A. Miller *Federal Practice & Procedure* § 2948, at 433–34 (1973). Because of the unique nature of the rights conferred to the public by NEPA, the court is convinced that there is a potential for such harm in this instance.

In *Jones v. District of Columbia Redevelopment Land Agency*, 499 F.2d 502, 512 (1973), the Court of Appeals for the District of Columbia Circuit stated:

NEPA was intended to ensure that decisions about federal actions would be made only after responsible decision-makers had fully adverted to the environmental consequences of the actions, and had decided that the public benefits flowing from the actions outweighed their environmental costs. Thus, the harm with which the courts must be concerned in NEPA cases is not, strictly speaking, harm to the environment, but rather the

failure of the decision-makers to take environmental factors into account in the way that NEPA mandates.

That definition of harm is consistent with NEPA's intent to avoid the "irreversible and irretrievable commitment of resources" to a project prior to the agency's making a determination as to the project's impact on the environment.

■ The defendants contend that the harm facing the plaintiffs is not irreparable because the wires, towers and footings for the ± 400 kV dc HVTL could be removed and the land restored if the court ultimately determined that the EIS was inadequate and if the REA were to prepare an adequate statement on the basis of which the REA concluded that the powerline should not be built at all or that it should not be built along the present route. This position is untenable. Once the ± 400 kV dc HVTL has been completed, any environmental harm it would cause will have to be tolerated. Even if the court were to order further supplementation following completion of the ± 400 kV dc HVTL, supplementation would probably be nothing more than a meaningless formality. *See, e. g., Arlington Coalition on Transportation v. Volpe,* 458 F.2d 1323 (4th Cir. 1972).

### B. Balancing of Harm

■ Even though the harm involved is in this sense irreparable, the court concludes that such harm would not warrant the granting of a preliminary injunction. The harm to the plaintiffs and to other similarly situated members of the public is limited to allowing the REA to proceed without requiring the agency to supplement the final EIS. The plaintiffs have conceded both that the power to be generated at Coal Creek Station is needed and that there is no feasible alternative to the construction of an overhead transmission line. Therefore, the only ultimate change that might result from requiring the preparation of another supplement would be to change the route of

the ± 400 kV dc HVTL. Whatever the effects of the electrostatic and electromagnetic fields created by the line may be, they would remain the same; only the persons affected would change. The only conceivable advantage which might be realized would be to reposition the HVTL on section lines so as to lessen its interference with agricultural aviation.

This is not a case where requiring a more adequate EIS might result in the discontinuance or the scaling down of the project so as to minimize its environmental effects. The plaintiffs concede that a powerline will be built and that it will be built in its present form even if it is not built along the presently designated route. Nor is this a case where a more adequate EIS would result in a rerouting which would dramatically alter the project's environmental impact. The line will remain an overhead ± 400 kV dc HVTL that crosses lands whose uses are predominantly agricultural.

On the other hand, the harm to CPA and UPA and, more importantly, the harm to the general public which would result from enjoining further construction would be considerable. The direct costs which CPA and UPA would incur as a result of enjoining construction would be in excess of $6,000,000.00 per month. Undoubtedly, those costs would ultimately be passed on to the approximately one million persons who receive their electric power from CPA and UPA member cooperatives. It is also possible that delay might cause a decline in the reliability of electric service for the approximately one million rural consumers served by CPA and UPA because of the ever increasing demand for electricity.[3]

### VI. LACHES

■ The court is also convinced that the doctrine of laches would operate to bar the plaintiffs from the relief which they seek. It is true that laches is not favored in NEPA cases. *Minnesota Public Interest Research Group v. Butz,* 498 F.2d 1314, 1324

---

**3.** At the present time, CPA and UPA are capable of generating less than thirty percent of their users' peakload demand. In the future,

they will no longer be able to purchase as much power as they now do.

(8th Cir. 1974) (*en banc*). However, it is also true that laches is available in a NEPA case when a party seeking injunctive relief has engaged in inexcusable delay which results in prejudice to the other party. *Iowa Student Public Interest Research Group v. Callaway*, 379 F.Supp. 714 (S.D. Iowa 1974).

■■■ The prejudice resulting from the delay in bringing this particular action is substantial. Members of the plaintiff States United for Rural Environment were aware of the existence of the draft EIS at least as early as July 18, 1974. Those persons chose other forums to urge decision-makers to take cognizance of the alleged environmental hazards of the ± 400 kV dc HVTL. For whatever reason, they chose not to sue under NEPA. They now turn to this court for relief.

If the plaintiffs had filed this suit in 1974 or even in 1975, the REA would have had the opportunity to supplement the final EIS so as to address the issues raised by the plaintiffs. Supplementing the final EIS then would not have delayed construction in any way. To prepare a supplement now would require a delay of at least six months and perhaps as long as twelve months.

The plaintiffs have offered no reasonable justification for their delay in bringing this action. The allegedly deficient final EIS was issued on August 4, 1974. The plaintiffs have watched as CPA and UPA commenced construction at Coal Creek Station, as the MEQC designated a route, as CPA and UPA acquired the right-of-way for the ± 400 kV dc HVTL and as CPA and UPA continued construction on that line. Now as the ± 400 kV dc HVTL nears completion, the plaintiffs wish to assert their rights. During this time the plaintiffs chose not to assert their NEPA rights; they will not be permitted to assert them at this late date.

### ORDER

Upon the foregoing,

IT IS ORDERED That the plaintiffs' motion for a preliminary injunction be and hereby is denied.